441

(No. 4791- )

MATTHEW M. WALSH and JOHN J. WALSH, A Co-Partnership, D/B/A WALSH CONSTRUCTION COMPANY, Claimants, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed May 12, 1964.*

GRAHAM, WISE AND MEYER, Attorneys for Claimant.

WILLIAM G. CLARK, Attorney General; SAMUEL J. DOY and LAWRENCE W. REISCH, JR., Assistant Attorneys General, for Respondent.

PEZMAN, J.

On September 30, 1957, claimants filed their original complaint seeking an award in the amount of $151,549.89 for losses, alleged to have been sustained by them in the construction of certain buildings at the Tinley Park State Hospital, Tinley Park, Illinois. On April 24, 1959, claimants filed an amendment to the complaint by adding additional items to the bill of particulars, and thereby increasing the ad damnum to $216,788.61.

The above entitled cause was heard by a Commissioner on December 19, 1958 at Chicago, Illinois. Claimant, Matthew M. Walsh, was the sole witness for claimants. Respondent's evidence consisted of the Departmental Report. On the 2nd day of June, 1959, the Court on its own motion found that the record was inadequate and insufficient for a proper consideration of the cause and of claimants' damages, and ordered the matter heard "en banc". The cause was heard in 1960 by the Court of Claims, consisting of Judge Gerald W. Fearer, Judge James B. Wham and the late Joseph J. Tolson, Chief Justice.

Since the facts of the case are extremely complex, a preliminary statement identifying the separate contracts, the location of the buildings, and the problems confronted are hereafter set forth.

Prior to June 1, 1951, the State of Illinois determined that a new hospital was needed, and a large tract of land, formerly a farm, was purchased near Tinley Park, Illinois. The firm of Skidmore, Owens and Merrill of Chicago, Illinois, was engaged as associate architects to prepare plans and specifications, and thereafter bids were taken for the proposed work. The project involved multiple bids for the different kinds of work to be performed, and claimants were the successful bidders on three of the jobs.

1. Contract No. 66921—Power Plant_____$370,411.00
2. Contract No. 6748—Water Treatment Plant_____ 334,000.00
3. Contract No. 6745—Sewage Treatment Plant_____ 227,000.00

The work was commenced at a time when the Korean War was in progress, and the matter of obtaining priorities for needed material was of great significance in the performance of the contracts.

For the purpose of clarity, each of the jobs will be identified by its number and discussed separately, and thereafter a summary of each claim will be set forth in a recapitulation.

## CONTRACT NO. 66921
## POWER HOUSE

The plans and specifications called for the construction of a two story brick and glass building, together with a full basement and smaller brick building located nearby.

Matthew M. Walsh testified that he examined the plans and specifications, and, prior to May 1, 1951, went out to the site to examine the premises, so that he could prepare a bid. (The plans were in accordance with usual

practices, requiring a bidder to inspect the site, as he would thereafter be charged with knowledge of bidding conditions.) An access road was under construction at the time, and he stated, though it was rough, he could and did drive over it to the area where the contracts were to be performed, if his firm was the successful bidder. The contract for the road had been let at a prior time, and was to be finished in 45 days, so that the other contractors would have access to the interior of the farm land to perform their work.

Claimants submitted their bids on May 5, 1951, and the State extended the time for acceptance to June 30, 1951, as the road was incomplete. Mr. Mocardell, Chief of Construction, assured claimants that the road would be completed when construction started. The road was not completed in the 45 days, and, in fact, was not completed until 1956 due to a peat condition, which was discovered in the road bed.

Claimants lay great stress on this absence of an access road, as their bid was predicated on the plans, which described the road in the blueprints, and their examination of the building site, which showed the road under construction, and their assurances that a hard road would be ready for them to haul in steel, concrete, etc., needed in the performance of their contract.

On July 10, 1951, claimants started the excavation of the basement, and completed it on August 17, 1951. Wooden perimeter forms were set so that the concrete floor could be poured.

At this state of the construction, plumbers should have been installing drains, and electricians should have been installing conduits, and, if this had, in fact, been done, the entire floor would have been in place by September 4, 1951.

It was then discovered that the plans for plumbing and electrical work were incomplete, and Mr. Gilbertson, Field Superintendent for the State, stopped the pouring of the concrete.

While claimants waited for the State to procure plans and specifications for the plumbers and electricians, who were bidders on separate contracts, torrential rains hit the area, and claimants were obliged to pump the excavation for many days, and thereafter to remove and clean the reinforcing steel, remove and wire brush the steel rods, reset and realign the forms.

On October 5, 1951, claimants were directed to pour the slab despite the fact that the electrical conduits were not in place. At this point, claimants allege that the State was negligent in not having plumbing and electrical plans available, so that the work could have been performed a month earlier, and, if they had been available, claimants would not have had to pump the excavation, and re-do the work that was in place ready for concrete.

On October 25, 1951, claimants started work on the walls. This work was stopped by the State, as the electrical plans were still incomplete, and no provisions were made for sleeves for the pipe contractor.

Claimants made repeated efforts to get the State Architect and the associate architect to complete the drawing, so that they could continue with the work. Months went by, and it was not until March 5, 1952 that claimants were authorized to proceed with the work. The basement concrete was not finished until April 24, 1952, many months behind the schedule.

The slab floor and walls had been poured with reference to the location of the steel to be erected on the area built up for a certain type of diesel motor and generator. It appeared that the electrical contractor was given the

option to install another type of equipment, and, when he exercised his option, the slab had to be altered, footings had to be cut, the roof had to be altered, and changes had to be made in the type and kind of steel.

Claimants urge that the State should have inquired as to the type of electrical equipment to be installed before directing claimants to comply with the original plan, and thereby avoided the additional work.

In summarizing Contract No. 66921, claimants allege that they bid the job, so that it could be completed in 360 working days, i.e., June 30, 1952. They allege that the State failed to provide other contractors with plans and specifications on time, so that their work could be correlated into his contract. They allege that changes in the plans threw their work schedule behind, so that they did not complete the building until June of 1954, and that they incurred great expense because of the neglect of the State.

### CONTRACT NO. 6745
### SEWAGE TREATMENT PLANT

Claimants were the successful bidders on the treatment plant, as their bid was accepted on July 20, 1951. The contract was to be completed in 360 days.

The excavation was started, but on August 1, 1951 they were instructed to suspend operations due to a pending revision of plans. On November 23, 1951, claimants were instructed not to have any steel fabricated for the sewage plant, as further revisions were being made.

On March 26, 1952, claimants began the excavations for the main control house, when peat was discovered. The architects directed claimants to halt operations. Work was again started, and the basement and walls were completed on July 1, 1952. When claimants requested the structural steel, it was found that none was available, and

the steel did not arrive until November or December of 1952.

Since the structure could not be placed under roof, due to the absence of steel, the rains, mentioned previously, filled the basement twice, and required days of pumping.

Claimants allege an unwarranted delay of nine months in furnishing plans as to all buildings, except the trickler filter, and, as to this structure, the delay was 13 months.

Claimants further allege the State was responsible for a four month delay in furnishing steel.

## CONTRACT NO. 6748
## WATER TREATMENT PLANT

This contract called for the construction of a control house, a water softening basin, a reservoir, 3 pump houses, and a water tank. Claimants' bid was accepted on July 20, 1951 with work to be completed in 360 days.

Despite the contract, a series of revisions were made by the architects, so that the work did not get underway for 23 months. The revised plans called for work that was not included in the original contract, and the claim for damages is summarized in the recapitulation.

Claimants in their brief have set up their claims under certain categories, as they affected all three contracts, and, for purposes of expediency, they were set forth as follows:

## BOX-OUTS AND SLEEVES

All of the buildings constructed under the three contracts required pipes to be inserted in the outer walls for water, steam, sewage, etc.

Box-outs are forms inserted in the walls prior to the pouring of concrete, which are thereafter removed, so

that sleeves may be placed in order that pipes may be inserted inside the sleeves.

If the plans had been completed properly and on time, the box-outs would have been installed when the forms were set, and the walls would have been poured in the conventional manner.

For reasons that were never explained by the architects at the hearing, the plans were totally deficient as to type, size, and location of these box-outs, and, after the walls were poured, claimants were instructed to go back and cut the walls, frame, brace and grout, and install the box-outs.

As to this element of damage, the State has admitted its error in the plans, and the work was thereafter ordered to be performed by claimants. The summary of this claim is as follows:

No. 66921—Power Plant
 Constructing box-outs _____$675.54
 Forming, bracing, grouting _____578.13
No. 6754—Sewage Treatment Plant
 Constructing box-outs _____6,530.69
 Forming, bracing, grouting _____5,881.55
No. 6748—Water Treatment Plant
 Constructing box-outs _____1,853.98
 Forming, bracing, grouting _____2,167.48

 Total _____$17,687.37

With respect to this claim, Mr. Gaunt, Chief of Construction for the State of Illinois, was requested by the Department of Public Welfare, to prepare a cost breakdown of the claim. He testified that, in his opinion, the amount of damages sustained was $13,748.18.

## LACK OF ACCESS ROAD

As was mentioned earlier in the opinion, the plans showed an access road, which was under construction in May of 1951. This contract was let on January 9,

1951 with a completion date of 45 days. Due to the peat condition encountered, the road was not completed until 1956, and was, therefore, unavailable to claimants.

Claimants allege they bid the job on the assurances that the road would be available, and, therefore, arrived at a figure using batch concrete at a cost of $8.50 per cubic yard.

The only other road available was a farm lane, and in wet weather this road became a sea of mud.

Claimants allege that they were unable to move trucks into the field to prepare batch concrete, and were compelled to buy ready-mix concrete at a cost of $10.75 a yard, a difference of $2.25 per yard. They were only able to accomplish this by hooking a bulldozer to the ready-mix truck, and pulling it to the job site.

The three contracts called for 7,200 yards of concrete, 1,500 yards of which were batch concrete, and the balance was ready-mix.

Claimants allege that they rented a bulldozer for 162 days at a cost of $80.00 per day to pull the ready-mix trucks through the fields.

Claimants also allege that they were obliged to truck their employees to and from the job site due to lack of roads with the attendant loss of working time.

As further proof of undue delay on the part of the State, claimants allege that repeated requests were made upon the State to secure the necessary priorities for steel. Mr. Gaunt testified that it was the responsibility of the State to get the priority, but for some reason the State neglected to do so.

The amended complaint summarizes the balance alleged to be due claimants as follows:

Power Plant—
 Increases in the cost of labor and materials, supervision, overhead, insurance, etc., on Contract No. 66921___$31,396.31

Water Treatment Plant—
Increases in the cost of labor, materials, supervision, overhead, insurance, etc., on Contract No. 6748_____25,851.78

Sewage Treatment Plant—
Increases in the cost of labor, materials, supervision, overhead, insurances, etc., on Contract No. 6754_____19,825.72
Pumping of excess water from farm drainage systems, Contract No. 66921_____8,351.70
Pumping of excess water from farm drainage systems, Contract No. 6748 _____7,530.60
Pumping of excess water from farm drainage systems, Contract No. 6754 _____5,117.70
Additional labor necessary to complete Contract No. 66921 _____66,492.60
Additional labor necessary to complete Contract No. 6748 _____37,193.30
Additional labor necessary to complete Contract No. 6754 _____35,028.90

Total _____236,788.61
Paid by respondent on above_____20,000.00

Balance due _____$216,788.61

When this case was tried before the Court, claimants discovered that certain payroll records were duplicated on some of the exhibits, and, to conform to the proofs, the ad damnum was reduced from $216,788.61 to $166.053.43.

Mr. J. N. Gaunt, Supervising Architect, testified as an adverse witness for claimants and as a direct witness for the State. He confirmed generally the allegations of claimants as to unreasonable delays, failure to provide plans and specifications on time, changes in plans, failure to obtain priorities, increases in the cost of labor and materials throughout the building period, but he denied the rights of claimants to the profits on the work done, as prayed for in the amended complaint. He summarized his estimate of their losses as follows:

(a) Box-out openings _____$ 13,748.18
(b) Increased cost of concrete and materials to the job _____ 25,875.00
(c) Increased cost of direct expense _____ 17,100.00

| | | |
|---|---|---|
| (d) | Increased cost of labor and materials | 27,747.88 |
| (e) | Additional labor based on ⅓ of the claim | 25,941.07 |
| | Total | $110,412.13 |

This case has been tried twice, once before the Commissioner, and again before the Court en banc. The record is voluminous, and hundreds of exhibits have been introduced in the case. It is difficult to summarize the many facets of the case, but, in general, it appears that there was a great need for a hospital facility, and the State decided to build it at the time despite shortages. The general contracts were let before the plans and specifications of the sub-contracts were in bidable form. The most glaring error in the all-over program was the lack of available drainage for the project. This, coupled with unprecedented rains, did more to increase the costs of the contracts than any other matter.

The State has admitted from the outset that claimants were entitled to additional compensation, but it is apparent from the testimony that this project, with all its complexities, developed ill will between the associate architect, the State Architect's Office and claimants to the point where it was impossible to review and adjust these differences while records were available in the respective offices.

The State has acknowledged the errors and omissions on its part, and concludes that claimants are entitled to additional compensation in the amount of $110,412.13.

Claimants allege that they need not prove their claim with mathematical certainty, and state that they furnished the associate architect and the State with numerous receipts and invoices that would prove their claim, but that such records were lost or misplaced by them; so that they were not available to claimants when requested.

The Court does not believe that such alleged loss of records by the State should excuse claimants from keeping adequate records of their own, and in this regard the Court will not speculate on damages that are alleged by claimants.

It further appears to the Court that claimants have engaged in institutional building for a number of years. When the innumerable problems arose, a prudent contractor would have stopped the job until the several contracts were in shape, so that the work would be done in accordance with good building practices, and, since they failed in this regard, they must share in part of the responsibility.

This Court has held that, where a contractor has been prevented from performing his contract by the State, an award will be made for the increased costs necessitated by the delay. *Divane Bros. Electric Co., A Corporation*, vs. *State of Illinois*, 22 C.C.R. 546.

Where it appears that a contractor was damaged by reason of a change of plans by the State, an award will be made, and, if extra work is ordered, a claimant will be entitled to an award. *Hyre Electric Co., An Illinois Corporation*, vs. *State of Illinois*, 22 C.C.R. 555.

The State is liable for actual damages sustained by a contractor arising from unreasonable delays caused by the State. *Bosley Wrecking Company, An Illinois Corporation*, vs. *State of Illinois*, 23 C.C.R. 126.

On the basis of the above authorities, the Court finds that an award should be made to claimants.

Pursuant to motion on behalf of claimants, the suggestion of death of John J. Walsh on the 25th day of September, 1961 was entered of record, and it was ordered by this Court that the suit proceed in the name of Matthew M. Walsh d/b/a Walsh Construction Company.

An award is, therefore, made to Matthew M. Walsh, d/b/a Walsh Construction Company, in the amount of $110,412.13.