**Kenny Construction Company of Illinois, an Illinois Corporation, Also Known as Kenny Construction Company, an Illinois Corporation, Plaintiff-Appellee, Cross-Appellant, v. The Sanitary District of Greater Chicago, Defendant-Appellant, Cross-Appellee.**

Gen. No. 53,764.

First District, First Division.

August 17, 1970.

Rehearing denied September 14, 1970.

Allen S. Lavin, Sidney B. Baker and James Kennedy, of Chicago (Ralph Brill and Fred Herzog, of counsel), for appellant.

Healy, McGurn & O'Brien, and O'Keefe, O'Brien, Hanson & Ashenden, of Chicago (Donald V. O'Brien and James H. O'Brien, of counsel), for appellee.

MR. PRESIDING JUSTICE BURMAN delivered the opinion of the court.

This is an action commenced by the Kenny Construction Company (hereinafter referred to as "Kenny") against the Metropolitan Sanitary District of Greater Chicago (hereinafter referred to as "District") to recover an adjustment of the price of a sewer construction contract necessitated by allegedly unforeseen and unexpected subsurface conditions. The defendant waived a jury, and the case went to trial on May 13, 1968. Testimony was concluded on June 10th. A judgment was entered in July for the plaintiff in the amount of $131,237.71, from which defendant appeals. Plaintiff cross-appeals as to the adequacy of the amount awarded.

In 1958 the District advertised for sealed bids for the construction of a sewer in Wheeling Township, Cook County, Illinois, which was to connect with an existing intercepting sewer. All of the plans and specifications were made available to plaintiff and the other prospective bidders. The nature of the construction job was partially described as follows:

> The work consists of building approximately 8,100 linear feet of concrete sewer of 4 feet 6 inches internal width and 5 feet internal height in tunnel, three junction chambers and one transition with manholes and miscellaneous structures and work collateral thereto . . . Portions of this work may require the use of compressed air due to bad soil conditions to be encountered in tunneling.

Kenny had much experience in sewer construction for the District. Before preparing its bid its personnel read the contract documents, specifications and plans. They

went to the site, looked at the job from the standpoint of obstructions, reviewed the soil borings in the District's files, including information of soil samples, and made their own soil borings. They ultimately submitted a bid of $1,138,250.00 which was the lowest bid of the six interested bidders in the computation of the unit and lump sum prices set forth in the contract and their bid was accepted.

The general provisions of the contract contained the following:

Extra work.

> Art. 7. The Contractor shall perform such extra work as the Engineer may direct in his written order, provided that no extra work, the total price or cost of which is in excess of Twenty Five Hundred Dollars ($2500.00), shall be performed by the Contractor until the Engineer is authorized by the Board of Trustees of said Sanitary District to issue a written order therefor, and shall have issued such written order . . . .

The provision further requires that all claims for extra labor, rental of equipment or material furnished must in any event be presented to the engineer and to the Trustees' committee on engineering within thirty days after the end of the month during which such extra work was done. Under the heading of "Estimating Extra Work" appears the following:

> RENEGOTIATING: Where unforeseen or not anticipated conditions develop in the construction of this project so that there is a variation of 15 percent in quantities of materials required (either more or less than the original estimates), then either the Metropolitan Sanitary District of Greater Chicago or the contractor shall have the right to demand an exami-

107

nation of the site and immediate renegotiation as to the quantities and amounts.

CHANGED CONDITIONS: Should the Contractor encounter during the progress of the work subsurface conditions at the site materially differing from any shown on the contract drawings or indicated in the specifications or such conditions as could not reasonably have been anticipated by either the Metropolitan Sanitary District of Greater Chicago or the contractor which conditions will materially affect the cost of the work to be done under the contract, the attention of the Chief Engineer must be immediately called to such conditions before they are disturbed. The Chief Engineer shall thereupon promptly investigate the conditions and if he finds that they do so materially differ, the contract may with his written approval be modified to provide for increase or decrease of cost and/or differences in time resulting from such changed conditions. Any increase in costs resulting therefrom should be subject to approval by the Board of Trustees.

The major item in the contract was Item I, providing a price of $109.50 per lineal foot for excavation, the unit price for each item, complete in place. Approximately 3,093 linear feet were completed without any problem by using a method of mining and removing material in free air, then placing steel ribs and hard wood lagging to hold back the earth and finally pouring the concrete. Payments were made by the District as the work progressed.

At another portion of the work, Kenny subsequently encountered bad soil conditions and a cave-in occurred on August 4, when the miners unearthed running sand and silt, i. e. underground water bearing quantities of fine unstable particles of soil. Kenny's engineer testified that the job called for both free air and compressed air and

that they knew they would need compressed air for approximately 45 percent of the job. Efforts to mine this unstable soil proved futile even under compressed air.

When the attempt to drive the tunnel under compressed air from a lock built in the tunnel section failed, Kenny abandoned the work. John Kenny, President of Kenny, testified that a meeting was held in September, 1959, with Burton Scheidt, the District's Chief Engineer, and his Assistant Chief Engineers to consider possible ways to overcome subsoil conditions. He testified that Scheidt stated that if Kenny would drive steel sheet piling and perform the work in open cut, the lock could be extended. Kenny agreed to this. He testified further that he asked Scheidt how he would be compensated and Scheidt said "Go out and do as we have decided to do at this meeting, and we will discuss the payment later." He said he repeated two or three times at the meeting that he had to be paid for the work and that Scheidt said "that to attempt to forecast or to permit us to give him a price at that time for the work, did not seem fair; that he felt that it would be fairer to both parties if we did as he had suggested, go out, produce the work, and then come back in, after the work had been completed, and he and his forces would have a better opportunity to evaluate the costs." Kenny who testified that he was familiar with the practices of the District said he believed and relied upon Scheidt's statements.

In addition, Mr. Kenny wrote a letter to the District to Scheidt's attention on September 14, referring to the meeting and stating:

> This work will be done and we wish to point out that we consider this situation a changed condition, subject to renegotiation and are proceeding assuming that we are to be paid for all expenses incurred.

On September 18, plaintiff submitted a procedure and an engineering drawing for the work discussed at the meet-

ing. Mr. R. H. Kelly, the District's Assistant Chief Engineer, approved the drawing as a working plan in his letter of September 24, subject to Kenny's "agreement that it shall in no way affect the contractor's responsibility or relieve him of any liability which may arise." On November 17, 1959, Kenny again wrote to the District that the subsurface conditions have proven to be materially different than those originally assumed at the September 14 meeting and "as required by the contract, your attention is further called to the unforeseen changed conditions." They suggested that the 3,076 feet stretch either be deleted from the contract or constructed with revised plans and methods under an agreed change order. "The steel-sheeted open-cut work near Sta. 16, decided on September 14, has cost approximately $95,800 to date and a pertinent change order covering such extra work is respectfully requested."

On November 19, Scheidt replied by letter that the present completed portion of the work was of no value because there was no sewage outlet for any portion of the completed work. "At the present time we do not have any assurance from your company that the south portion of the contract will be completed and made available for service; therefore, it is impossible for us to consider any revisions, changes or deletions in this contract" between certain specified stations.

On December 17, Kenny again wrote to the District summarizing the inability to tunnel in the unstable ground because of excessive cave-ins, suggesting an attempt to resume mining under a different construction method, the "liner plate method." He also stated "if your decision is that a reasonable attempt be made to tunnel this stretch by the method of liner plates, we propose a price of 25 cents for a new bid item of liner plates. Further, because of the changed conditions and methods, it would be necessary to modify our contract price for Bid item 1." Thereafter, there were meetings, discussions and additional

correspondence as to the "liner plate method" but nothing was resolved.

On January 28, 1960, Scheidt wrote to Kenny acknowledging receipt of the various letters:

> . . . with reference to your claim for extras as a result of alleged subsoil conditions which you claim could not have been anticipated at the time of the execution of the above referred to contract. Our engineers have been examining your claims and it is impossible at this time to determine whether those claims are covered by the renegotiation clause in your contract. If the existing conditions are such that they could have been anticipated prior to the commencement of the work, the renegotiation clause would not cover any change in conditions and you would be obliged to perform in accordance with the other provisions of the contract. We do not wish to preclude a claim for extras at present, but we feel as though the work under the contract should be completed in accordance with the terms thereof, and upon completion, full consideration will be given to all of your claims.

On February 2, Kenny replied by letter that they did "not understand why any judgment of changed conditions should be deferred to some future date, inasmuch as the facts have already been submitted and are available now. We again request the findings of the Chief Engineer as to the changed conditions." On February 5, Scheidt wrote to Kenny that the District was informed that the contract was in a no-work status since November 17 and advised that unless the work was recommenced immediately, it would be obliged to declare a default on the performance bond.

Kenny testified that he then received a phone call from Frank Chesrow, the President of the District in the latter part of February, inviting him to discuss the status of the

111

contract and what the difficulties were. He said he told Chesrow that they had had meetings with the Engineering Department of the District in which they had suggested using liner plates and steel ribs for the construction, but he had not received approval. Chesrow told him he would talk with the Engineering Department in an attempt to get the job under way. Kenny said he brought up the point of payment and told Chesrow he would consider going back to work only if he would be told that he would be paid. Chesrow replied that he would talk to his Engineering Department and if agreeable to them, Kenny would be compensated for his work for producing the sewer.

Scheidt called him about the first week in March and they met in Scheidt's office with Mr. Kelly, the latter's assistant and Scheidt told him they were willing to try the method of liner plate construction which was a much more costly method than the method recited in the contract. Kenny told him he would do it if they could agree on a price and he gave them a price of 23 cents a pound to which he said they agreed. He said he told them that this was not the total solution of their problem and it was necessary to review the monies he had expended for producing the tunnel to date and the additional money they would need because of the change in method and a much slower method than was originally conceived and used. He said Scheidt told him that he had pointed out to him that the method he would like to employ was that Kenny proceed with the work so that they might be paid at a later date stating that it was much more realistic for them to evaluate the work after completion when all of the contractor's expenditures could be checked than to accept an amount from the contractor which might be exorbitant before the work was started. Kenny said he believed the representations made by Scheidt and relied on those representations in undertaking the balance of the work. He also stated that it was

the practice of the District with which procedure he was familiar that the work to be undertaken was to be performed, and then evaluated, and then an agreement made as to the price, after the work had been finished.

On March 31, 1960, the Committee on Engineering appeared before the District's Board of Trustees and reported that in accordance with the negotiation clause of its contract, the contractor advised the District's Chief Engineer of the unforeseen and unanticipated soil conditions he encountered, that it was decided that the contractor resume tunnel operations by the new method of using steel liner plates and steel ribs at a price of 23 cents a pound for liner plates. The Board gave Scheidt authority to use the new method at a cost of 23 cents a pound and, if it proved satisfactory, Scheidt was authorized to use it where necessary for completion of the contract work.

The sewer was completed on October 10, 1960. Kenny submitted by a letter addressed to Scheidt on May 26, 1961, their itemized claim for adjustment of the contract price in the amount of $495,347.11. It indicates that their total bill was $1,274,170.12 and that they had received $778,823.01, which included the 23 cents a pound for the liner plates leaving a balance of claim for $495,347.11. This claim was rejected by Scheidt in his letter of October 13, 1961, to which letter he attached a report given by the District's Attorney, George A. Lane. In this report, Mr. Lane stated adjustments had been made authorizing a revision of tunnel construction provisions at extra costs, which were paid. Also that after notification by Kenny of unforeseen underground conditions that were encountered, a major part of the sewer remaining to be performed was eliminated from the contract at Kenny's request and substituted in lieu thereof 1270 linear feet of 18-inch pipeline and pumping station at a cost to the District of $112,400.00, which had also been paid. He added that as a result of the two Board

actions of March 31, 1960, and September 8, 1960, specifically modifying the contract after renegotiation they paid the extra costs therein provided and agreed with Scheidt that Kenny's claim should be rejected. Thereafter, pursuant to a District Board action of November 9, 1961, the District authorized a final payment in the sum of $38,169.70 to Kenny.

On April 9, 1963, plaintiff filed this lawsuit claiming $412,496.40. In an amended complaint, it sought $512,469.11, itemized as $342,946.60 additional costs for the south end of the project, $119,155.73 for the "cofferdam" or bracing and sheeting work at the north end, and $50,366.78 for delay and equipment costs and the same amount was claimed in its second amended complaint.

During the trial which lasted five weeks, the court ruled that the schedule of amounts claimed by Kenny for the use of equipment was not admissible. This changed the original claimed amount. Again the court held that all the profits and losses should go into one computation for a net figure. Hence, there were many figures and computations. The court concluded that the law of Illinois did not allow a contractor to change a unit-price lump sum contract for public construction into an unwritten arrangement for time and material plus overhead and profit and therefor denied the claim for overhead and profit. The court pointed out that Kenny's General Ledger indicated "Job Cost account Sheet No. 14 shows a total cost of $949,832.16, and credits of $816,922.71" and the words "Final before suit." The difference is $132,839.45. After another adjustment judgment was entered for plaintiff for $131,237.71, which the court found was Kenny's adjusted minimum net cost for changed conditions on the south end of the job.

We will first determine whether the increased cost for the alleged extra work was approved by the District as required by the contract or whether the requirement of such approval was waived. If neither is the case, then

114

Kenny may not recover whether the work was extra or required by the contract.

■ Kenny initially argues that the "Extra Work" and "Changed Conditions" provisions are separate and distinct. We do not agree. The "Changed Conditions" provision was added to the end of Article 8, "Estimating Extra Work." It was not set off as a separate article, but denoted a particular kind of extra work and included the statement that "Any increase in costs resulting therefrom should be subject to approval by the Board of Trustees." It is apparent that because of the large sums of money involved and the overriding public interest in public improvement contracts, paid out of tax revenues, the "Extra Work" and "Changed Conditions" provision was added to the contract to guarantee against claims for further payments other than those specified in the contract which was awarded to Kenny as the lowest bidder. See 43 Am Jur Public Works & Contracts, § 117.

The "Extra Work" provision states that extra work shall require a written order by the Chief Engineer and, if the cost exceeds $2500.00, authorization by the Board of Trustees. This provision further states that all claims for extra costs from any cause whatsoever must be presented to the engineer and the committee on engineering in writing within thirty days after the end of the month during which such extra work was performed. These provisions are specifically made conditions precedent to any recovery for any extra work performed.

The record establishes that Kenny did get written approval from the District's Chief Engineer for a change in the method to be used in regard to the north end sheeting and bracing. However, it did not get the necessary written approval from the Chief Engineer to treat the work as an extra and to be compensated for extra costs. It also failed to present any specific claim for extra work to the Chief Engineer or the committee on engineering in writing within thirty days after the end of the month

115

as required, and it failed to establish any authorization by the Board of Trustees for the performance of extra work to be paid for by the District as extra costs.

Kenny, who was familiar with the type of contract in question and with the policies of the District, did secure an order from the Board approving the modification of the agreement to allow the construction to proceed by the liner plate method as described in plaintiff's letter of March 29, 1960, to the District at a cost of 23 cents per pound. If there were going to be a claim for compensable increases in costs beyond the 23 cents per pound, Kenny was obliged as a condition precedent to recovering to obtain the consent of the Board for a claim of further extra costs. Kenny did not present any claim for additional costs at the time it received approval of the liner plate method and its increased cost per pound nor did it get any such approval from the Board.

██ Kenny thus did not get the written approval of the Chief Engineer and the Board of Trustees for its alleged extra costs other than for the 23 cents per pound for the liner plate. In Joliet Bridge & Iron Company v. East Side Levee & Sanitary District, 210 Ill App 575, it was held that a contractor could not recover for extra work in removal and replacement, under the direction of the engineer in charge, of a span of bridge for the benefit of another contractor where no estimate in writing was made by the engineer as to the cost thereof, and no agreement made in reference thereto as the contract required.

██ We now turn to the question of waiver. There is no evidence in the record that would support the conclusion that the Chief Engineer determined that the District would pay extra costs for the change in work method involved here. In its correspondence with the Chief Engineer, Kenny did call attention to what it alleged were changed conditions and did seek payment. The record shows that on January 28, 1960, the Chief Engineer advised Kenny that full consideration would be given to

116

Kenny's claim at the completion of the work. The Chief Engineer, subsequently did then make a determination that the work was within the contractor's obligation under the contract and denied Kenny's claim. At no time did the Chief Engineer give Kenny written approval for extra work and extra costs, and, even if he had done so, he could not waive the additional requirement of authorization by the Board of Trustees.

■ Neither do the actions of the President of the Board of Trustees amount to a waiver. While there was a no-work status on the project, Mr. Kenny met with Frank Chesrow, the President of the District, in Mr. Chesrow's office and at his request. Mr. Kenny testified that he informed Mr. Chesrow that no approval or disapproval had been given him on his suggestion of another method to be used than that of using liner plates and steel ribs. Chesrow replied that he would suggest to the Engineering Department that they meet with Kenny in an attempt to get the job under way. Kenny also testified that he told Chesrow that he would consider going back to work only if he were told he would be paid. According to Kenny, Chesrow said "that he would talk to the Engineering Department, and if agreeable to them, that we would be compensated for our work for producing the sewer." This conversation was not a waiver by Chesrow, but an attempt to get the work restarted. Even were it a waiver, the President of the Board is only one member of the Board and cannot waive the approval of the Board required by the contract. Salfisburg & Co. v. City of St. Charles, 154 Ill App 531.

At Kenny's request, and in view of the difficulties, the Board of Trustees modified the contract by deleting some of the work originally required. The Board also approved a change in the method to be used on the north end and authorized the use of liner plate at 23 cents a pound on the south end. There is no evidence that the Board had knowledge of any other requests by Kenny for extra

compensation. It cannot be said to have waived the conditions precedent of the contract.

Kenny relies on Stahelin v. Board of Education, School Dist. No. 4, Du Page County, 87 Ill App2d 28, 230 NE2d 465. In Stahelin, unlike the case at bar, there was no dispute that extras had been incorporated in the school building. The school board was aware that changes were being made for which extra compensation would be sought. "It understood and consented to the procedure which was followed by its agent, the architect, in ordering certain changes, with the adjustment for extras and credits to be made at the end of the job." 87 Ill App2d at 38, 230 NE2d at 470.

Great Lakes Dredge and Dock Co. v. City of Chicago, 353 Ill 614, 158 NE 196, is also distinguishable. While the contractor in that case was at work on the project of straightening the south branch of the Chicago River, Lake Michigan increased the water level in the river about four feet above the flow line designated in the plans for the project. This made it impossible to continue the dock work in the manner provided in the plans and specifications. The City did not deny that the contractor had a right under the contract for additional time required for the recession of the water and had recognized that this delay would be very costly to the City. As the additional work progressed the items were checked by the City and computed on the basis of the unit price. There was direct evidence that the City Council had full and complete knowledge of this situation and the contractor's expectation of payment while the work was proceeding, but failed to stop the work or repudiate the agreement of its Chief Engineer made for this emergency. In the case at bar, the District's Board of Trustees had no knowledge until after all of the work was completed that Kenny was demanding further payments. As we have pointed out, Kenny did seek approval of the Board for the use of liner plates and their cost and was

118

given such consent, but did not seek a commitment from the Board at the time or at any other time while the work was in progress to pay for other additional costs.

In Anderson Co. v. City of Highland Park, 276 Ill App 327, the Board of Local Improvements had knowledge that plaintiff was performing engineering services for the City and accepted the results of the services for the estimate of the cost of a special assessment project. The court held that since the City had accepted the benefits of plaintiff's work, it would be unjust to permit the City to defeat plaintiff's claim because plaintiff had not strictly complied with certain ordinances. In the case before us, other than for the instances detailed above, the District Board of Trustees never considered that extra work was being performed in addition to the performance due under the contract and no action or agreement on its part showed any acceptance by it of extra costs to be paid by the District.

The case at bar is a good example of the need for "extra work" clauses in public works contracts and compliance therewith. The proposal for bids and the contract itself informed the contractor of the general nature of the work including the warning of possible poor soil conditions. The contractor was told that these poor conditions, if found, would possibly necessitate the use of compressed air and therefore the use of air locks which might require the installation in open cut. Yet at the completion of the work, the Board of Trustees was for the first time presented with a bill for approximately $500,000.00 for extra work of this type.

Since we have determined that defendant is not liable to plaintiff for any extra costs, the judgment rendered in behalf of plaintiff is reversed.

Reversed.

MURPHY and ADESKO, JJ., concur.