(No. 43684.—

KENNY CONSTRUCTION COMPANY OF ILLINOIS, Appellant, v. THE METROPOLITAN SANITARY DISTRICT OF GREATER CHICAGO, Appellee.

*Opinion filed December 17, 1971.*
*Modified upon denial of rehearing October 2, 1972.*

188

O'BRIEN, BOYLE, HAUGH and TRITTIPO, and O'KEEFE, O'BRIEN, HANSON, ASHENDEN and LYONS, both of Chicago (DONALD V. O'BRIEN and JAMES A. O'BRIEN, of counsel), for appellant.

ALLEN S. LAVIN, SIDNEY B. BAKER, and JAMES W. KENNEDY, all of Chicago (RALPH L. BRILL, and FRED F. HERZOG, of counsel), for appellee.

MR. JUSTICE WARD delivered the opinion of the court:

The plaintiff, Kenny Construction Company, brought an action against the defendant, the Metropolitan Sanitary District of Greater Chicago, in a dispute arising under a construction contract. A jury was waived and the circuit court of Cook County found in favor of Kenny and entered judgment for $131,237.71. The District appealed to the Appellate Court, First District, on the issue of liability and Kenny cross-appealed, complaining that the damages awarded were inadequate. The appellate court reversed the judgment of the circuit court, holding that the District was not liable. (128 Ill.App.2d 104.) We granted Kenny's leave to appeal under our Rule 315. 52 Ill.2d R. 315.

On December 23, 1958, the District and Kenny, which had submitted the low bid, entered into a contract for the construction of a sewer tunnel in Wheeling

Township in Cook County. The tunnel was to be constructed from an existing intercepting sewer at Isabella Street northwesterly to Euclid Road for 8,100 linear feet.

This language appeared in the contract:

"Insert these paragraphs at the end of Article 8, 'Estimating Extra Work', of the General Conditions—

\* \* \*

"Changed Conditions: Should the contractor encounter during the progress of the work sub-surface conditions at the site materially differing from any shown on the contract drawings or indicated in the specifications or such conditions as could not reasonably have been anticipated by either the Metropolitan Sanitary District of Greater Chicago or the contractor, which conditions will materially affect the cost of the work to be done under the contract, the attention of the Chief Engineer must be immediately called to such conditions before they are disturbed. The Chief Engineer shall thereupon promptly investigate the conditions and if he finds that they do so materially differ, the contract may with his written approval be modified to provide for increase or decrease of cost and/or differences in time resulting from such conditions. Any increase in costs resulting therefrom should be subject to approval by the Board of Trustees."

The work by Kenny, as ultimately performed, can be divided into three areas of construction. In the middle section Kenny sank vertical shafts to the required depth and mined tunnels in opposite directions. In this manner, 3,093 linear feet of tunnel were constructed and accepted by the District and for this work Kenny was paid in full under the terms of the contract.

At the north end of the proposed tunnel, unfavorable soil conditions were encountered. After an unsuccessful attempt to continue tunneling by means of a cofferdam, which was constructed by Kenny, the contract was modified. By the modification Kenny, as an alternative to the tunnel construction originally called for installed sewer pipe with an underground pumping station. When Kenny brought suit in the circuit court it advanced a claim for the extraordinary expense of the cofferdam's construc-

tion. This claim was not allowed in the circuit court and Kenny has not appealed the nonallowance. The circuit court's action was proper, for the modification prescribed that Kenny was to do the alternate work "for a total lump sum price of $112,400 with no payment for any other work north of station 30 + 90." Kenny accepted payment of the $112,400.

The controversy here arose from the construction performed on the south 1,600 linear feet. In that section, as in the north section, Kenny encountered water, running sand, silt, and other unfavorable subsoil conditions. Kenny unsuccessfully attempted to tunnel in free air and then compressed air, and finally attempted an open cut, using steel sheeting and air locks. This, too, failed, and Kenny abandoned work on this section, which was, of course, essential to the proposed sewer addition.

On December 17, 1959, Kenny wrote to the District, stating its belief that unforseeable and "changed" conditions had been encountered and suggesting an attempt be made to construct the south end by use of steel liner plates. The letter contained a suggested price for the plates and further stated that "because of the changed conditions and methods it would be necessary to modify our contract price for Bid Item 1." Bid Item 1 was the provision authorizing a payment of $109.50 per lineal foot for excavation. Subsequent letters by Kenny on January 5th and 7th restated and further explained its proposal.

There was further correspondence and on February 5 Scheidt, the chief engineer of the District, wrote that the contract's performance was in a "no-work" status and that unless the work was resumed, a default would be declared on Kenny's performance bond.

John B. Kenny, the president of Kenny, testified that in March he received an invitation from the president of the board of trustees of the Sanitary District to discuss the matter. They met and discussed getting the work under way again, and Kenny said, he testified, that he "would

consider going back to work only if I would be told that I would be paid." The president of the board, Kenny said, replied that he would talk to the engineering department, and, if it was agreeable to that department, Kenny would be compensated for its extra work. A few days later there was a conference between Kenny, Scheidt and R.H. Kelly, the assistant chief engineer of the District. At it, Kenny testified, Scheidt said he was willing to try the liner-plate method, and he and Kenny agreed on a price for the plates. Kenny testified that he said at that time that the agreement on the price was not the total solution and that it was necessary to review the matter to date, including the cost of the tunnel in the south section in light of the fact that the liner-plate method was a slower method than was originally planned under the contract. Scheidt's reply, according to Kenny, was that the method that he would like to employ was to let Kenny proceed with the work and be paid at a later date. It would be much easier and more realistic for the District's engineering department to evaluate the work after it had been completed, and check as to how much more the contractor had expended, than it would be to accept from the contractor before the work began an added cost which might be exorbitant. Kenny further testified that he accepted these representations and relied on them in undertaking the liner-plate work at the south end of the sewer.

Even though the contract appeared to call for a different approval, this was not the first time the chief engineer had employed this procedure. In regard to claims by Kenny for additional compensation for cofferdam, open cut and compressed air work the contractor had performed at both ends of the tunnel caused by what Kenny claimed were unanticipated subsoil conditions, on January 28, 1960, Burton Scheidt, the chief engineer of the District wrote to Kenny as follows: "Our engineers have been examining your claims and it is impossible at this time to determine whether those claims are covered by

the renegotiation clause in your contract. If existing conditions are such that they could have been anticipated prior to the commencement of the work, the renegotiation clause would not cover any change in conditions and you would be obliged to perform in accordance with the other provisions of the contract. We do not wish to preclude a claim for extras at present, but we feel as though the work under the contract should be completed in accordance with the terms thereof, and upon completion, full consideration will be given to all of your claims."

On March 29, Kenny sent the District a letter agreeing to resume work and use liner plates and steel ribs at a price of $0.23 a pound for the plates. The letter also stated that any order from the District to resume work should provide for the extra work required for the 40 linear foot steel sheet trench which would be necessary to permit the use of compressed air.

On March 31, the committee on engineering of the District reported to the board of trustees that Kenny had advised them of these claims of unanticipated soil conditions, and the committee recommended the use of steel liner plates and steel ribs. The board approved this recommendation and the price of 23 cents a pound for the plates. On April 11, Kenny was informed of this decision by Scheidt and the engineering department and was authorized to construct 400 feet by this method. Kenny was advised that if it proved satisfactory Kenny would be authorized to continue to use it for the remainder of the south end of the tunnel. (After completing the 400 feet of liner-plate construction Kenny apparently was authorized to continue using this technique in completing the remaining 1200 feet of the south section. In any event the District does not contend that Kenny did not have authority.) No mention was made of Kenny's claim for additional compensation for the extra labor required for liner-plate construction.

When Kenny's claim for additional compensation for

extra labor was submitted to the District upon completion of the entire tunnel and denied, Kenny filed suit against the District.

The circuit court held that changed conditions had been encountered within the meaning of the contractual provisions; that the District had waived and was estopped from requiring compliance with the contract provisions containing conditions precedent to the right of recovery for extraordinary expenses caused by changed conditions; and that contrary to the position of the District, there had not been an accord and satisfaction. The court found that Kenny had lost approximately $340,000 in completing the south end of the tunnel, and after deducting Kenny's profit on the north and central sections, entered judgment in Kenny's favor for $131,237.71.

In reversing the circuit court the appellate court held that the "changed conditions" clause, which we have quoted, was a part of the "extra work" provisions (articles 7 and 8) and not a separate provision as Kenny claimed. Thus, it was subject to the "extra work" provision requiring a written order or approval of the chief engineer and authorization of the board of trustees when the added cost would be in excess of $2,500. The extra work provision also required that all claims for extra costs from any cause must have been presented to the chief engineer and the committee on engineering within thirty days following the end of the month in which the extra work was performed. The appellate court held that Kenny had not secured the required written approval of the chief engineer to consider the work as an extra, had not presented its claim within the thirty-day period described above and had not obtained the authorization of the board for the performance of the extra work. It held further that none of the extra work conditions had been waived by the District.

An obviously important question is whether the "changed conditions" provision exclusively sets forth the

conditions to govern in the event "new conditions" are encountered (and the trial court apparently found it did) or whether all the other conditions of the "extra work" articles are to be considered as a part of the "changed conditions" provisions, as the appellate court expressly held.

Article 7 of the General Conditions is entitled "Extra Work," Article 8, "Estimating Extra Work" and Article 9, "Cost of Work." (Article 9 is a general provision of the contract and does not relate, save generally to Extra Work.) The "changed conditions" provision, together with a provision requiring immediate negotiations in the event of a departure of 15% from the contract's terms in the quantities of materials required, were added by an amendment that simply stated that these paragraphs were to be inserted "at the end of Article 8 ***."

We believe that the provision stands independently. Articles 7 and 8 clearly refer to a situation where the contractor is called upon to perform "extra work," that is, work in addition to his undertaking under the contract, which can only result in increased costs to the District. The paragraphs added at the end of Article 8 and captioned "Renegotiation" and "Changed Conditions" refer to contingencies which would decrease the costs to the District, as well as to situations which would increase costs. Thus, if, because of unforseen or unanticipated conditions, greater or lesser amounts of material are required, or the cost of the work to be performed is materially affected, the operation of the paragraphs may either raise or lower the costs to the District. We consider these provisions were inserted to stand independently of the paragraphs immediately preceding them, because they relate to different problems. Also, even where their application would involve greater rather than lesser cost to the District, through required extra work, it must be noted that the "changed conditions" provision concerns a specific type of extra work, namely, that caused by

changed conditions. We judge that the "changed conditions" provision was independent of the extra work provisions.

For the "changed conditions" provision to have been operative here:

1. The conditions must have changed. They must vary materially from those shown in the contract drawings or indicated in the specifications, or they must be such as could not reasonably have been anticipated by either party, and they must change materially the cost of the work to be done.

2. They must have been called by Kenny to the attention of the chief engineer of the District.

3. The chief engineer must have promptly investigated and if he found the described variance from the contract, the contract with his written approval might be modified to reflect the changed conditions.

4. Any increase in costs resulting therefrom "should" be subject to approval by the Board of Trustees.

The trial court found the subsoil conditions encountered represented a materially changed condition from the one anticipated. Findings of fact of the trial court will not be set aside unless they are contrary to the manifest weight of the evidence. (*Brown v. Commercial National Bank, 42 Ill.2d 365, cert. denied, 396 U.S. 961.*) From the record it cannot be said that this finding was contrary to the manifest weight of the evidence. Strong evidence supporting the finding is found from the fact that an entirely different construction method, *i.e.,* liner plating, was approved for the south area by the District. Clearly these "changed conditions" were called to the chief engineer's attention, satisfying the second proviso. The chief engineer, however, did not provide a written approval for the modification of the contract, and, of course, as there had

been no written approval by the engineer, there was no approval of a cost increase by the District's board of trustees.

Concerning the written approval of the chief engineer for the contract's modification, in the March conference between Scheidt and Kenny, Scheidt told Kenny to proceed with the work, with payment to be made at a later date because it was more realistic to evaluate the work after it had been completed. Under the circumstances we may consider the statements as an undertaking to pay for extra work after the work was completed if the conditions were indeed changed. As has been said, changed conditions were encountered, and, thus, this undertaking to pay became operative. The statement was relied on by Kenny to its detriment and the District was estopped from seeking to avoid liability on the ground that the chief engineer did not approve in writing. In *Frank Rosenberg, Inc. v. Carson Pirie Scott & Co., 28 Ill.2d 573, 584,* this court quoted with approval an observation made in *Dill v. Widman, 413 Ill. 448, 455:* "The general rule is that where a party by his statements or conduct leads another to do something he would not have done but for the statements or conduct of the other, the one guilty of the expressions or conduct will not be allowed to deny his utterances or acts to the loss or damage of the other party." The doctrine of estoppel is applicable to municipal corporations. *Gregory v. City of Wheaton, 23 Ill.2d 402;* See also *Cities Service Oil Co. v. City of Des Plaines, 21 Ill.2d 157.*

Referring to the question of approval by the board of trustees, the pertinent language of the "changed conditions" provision is: "The Chief Engineer shall thereupon promptly investigate the conditions and if he finds that they do so materially differ, the contract may with his written approval be modified to provide for increase or decrease of cost and/or differences in time resulting from such conditions. Any increase in costs resulting therefrom should be subject to approval by the Board of Trustees."

We consider it was contemplated under the contract that it would be the responsibility of the chief engineer, rather than Kenny, to present the modifications to the board for approval before he would authorize increased payment for the additional work performed because of changed conditions. Under the changed conditions provision, which we quoted in full earlier, it is clear it was the contractor Kenny who was to notify the chief engineer of encountering changed conditions. Any increase in the District's costs because of such conditions was to be approved in writing by the engineer. This increase in costs "should" be approved by the board of trustees. The provision, however, did not require Kenny to appear before the board or to request its approval of orders to proceed, which here Kenny received from the chief engineer. Considering the entire contract, it appears that the District's representative with Kenny in matters of construction was to be the chief engineer, and we judge that where board action was required, obtaining it was to be the responsibility of the chief engineer. That Kenny was not to have this responsibility was illustrated, we believe, by the parties in the procedure which was followed with regard to Kenny's proposal of the liner-plate method and the suggested price for liner plates. In that instance Kenny addressed the proposal to the chief engineer and the engineering department proposed the suggested modification to the board. Upon its approval, Kenny was notified by the engineering department that authority to proceed had been given by the board. This court said in *Olson v. Rossetter, 399 Ill. 232, 241:* "The rule is that where language has been used in a contract that is ambiguous, previous and contemporary transactions and facts may be taken into consideration to ascertain the true meaning of the contract and the sense in which the parties used the particular terms. [Citations.]" We consider that there was ambiguity in the contract's language in regard to the question of board approval and we consider that the procedure followed in

having the board approve the use of liner plates and the cost of the liner-plate material was a "contemporary transaction" within our holdings. It should be emphasized that this interpretation is predicated on the particular wording of this contract and no general principles relating to the principal-agent relationship should be drawn from it.

Furthermore, no matter who had the responsibility of obtaining board approval for the additional labor because of the unanticipated conditions, we deem there was a waiver by the board of the necessity of its approval. Kenny's letter of December 17 to the District stated not only the price proposed for the liner plate but that the labor cost, *i.e.*, bid item 1, would have to be amended. The subject matters of the letter also were communicated, in person by Kenny to the president of the board. Too, the board formally acted and approved one part of the letter's proposal by Kenny, namely, the price of the liner plates. We consider it can be said it had notice of the other part of Kenny's proposal and by its conduct waived any requirement of its formal approval of it. In a case with resemblance to the one here, the court in *Stahelin v. Board of Education, 87 Ill.App.2d 28, 42,* said: "In the present case the defendant had the general power to contract as it did. Apart from this it had the power to authorize expenditure of funds for the extras. It permitted the plaintiff to incorporate these extras into its building. The evidence established that the defendant had knowledge that it was intended that the amount of the extras and credits was to be adjudicated upon the completion of the work. It accepted the benefits resulting from this work and it cannot now be permitted to deny its obligation to pay for these items on the ground that there was no yea and nay vote taken to authorize the expenditure."

Another resembling situation appears in *Great Lakes Dredge and Dock Co. v. City of Chicago, 353 Ill. 614.* There the plaintiff had contracted to straighten the south

branch of the Chicago River. The contract provided the contractor should not be paid "for any work or material or *** any greater amount of money than is hereby stipulated to be paid, unless *** authorized by the city council of the city of Chicago and ordered in writing by the commissioner of public works." Subsequently, the level of the river rose, so that work under the original specifications was impossible. The commissioner orally ordered the contractor to perform the additional work required because of the high level of water and promised to send him a written order authorizing the payment of $150,000 for the additional work. The commissioner, however, was later advised not to send the written order without council approval. A request for approval by the council was made but it was never acted upon. Although the court first ruled the work order was for extra services and not a modification of the contract which required council approval, it also ruled: "The city, by standing by and without objecting, permitting this work to be done and accepting the benefits of that work, must be held to have ratified it. *** It was long ago said by this court: 'If one sees another doing work for him beneficial in its nature and by his agent overlooks the work as it progresses and does not interfere to forbid it, the work itself being necessary and useful, and appropriates the work to his own use, he might be liable on an implied promise to pay the value of the work.' [Citations.]"

Finally, the District claims that the negotiations and agreement resulting in the modification of the contract as to the work at the north section of the tunnel constituted an accord and satisfaction with regard to the entire contract.

The trial court found that there was no intent or manifestation of intent by the parties to enter into an accord and satisfaction. We cannot say that this finding was contrary to the manifest weight of the evidence.

We conclude that Kenny was entitled to compensation

for the additional work made necessary because of the changed or unanticipated conditions in the south section of the tunnel. Kenny performed the additional work under circumstances which amounted to an implied promise that it would be paid if it was subsequently determined that changed conditions had been encountered. We consider that the manifested intention of the parties was that the cost of any such services which might be required by "changed conditions" would be determined according to article 8 of the contract, "Estimating Extra Work." The "changed conditions" clause provides that recognized "changed conditions" call for a modification of the contract "to provide for increase or decrease of cost." We judge that the intent of the parties was that the modifications required would be according to the provision of the contract relating to extra work, *i.e.*, article 8. Thus, though the "changed conditions" clause was to be independent of article 7 ("Extra Work") so far as the conditions of article 7 were concerned, the mechanics for determining Kenny's compensation in the event that the changed conditions clause became operative was to be determined under article 8 ("Estimating Extra Work"). This would provide for compensation which would be consistent, basis-wise, with the compensation called for by the contract should the contractor be called upon for additional services which would fall within the "Extra Work" clause of the contract.

We judge that the circuit court erred when, after determining Kenny's loss in completing the south end of the tunnel, it deducted from it the profits Kenny had realized from its work on the north and central sections, and awarded judgment to Kenny for the balance. Considering the character of the changed conditions provision, the cost of services rendered under the provision should be determined without reference to the contractor's profits or losses upon unaffected or unmodified portions of the contract. The cause must, therefore, be remanded to the circuit court for a determination of Kenny's costs for the

liner plate construction performed at the south end of the tunnel. Kenny is entitled to compensation for such costs according to the contract and particularly according to article 8, less the amounts actually received by Kenny for the liner-plate construction and any other deductions the circuit court may find to be applicable.

For the foregoing reasons the judgment of the appellate court is reversed and the cause is remanded to the circuit court of Cook County for the determination described.

*Reversed and remanded, with directions.*