(No. 86-CC-3563–■■■■■)

ILLINOIS CONSTRUCTORS CORPORATION, Claimant, *v.*
THE STATE OF ILLINOIS, Respondent.

*Opinion filed April 6, 1993.*

O'BRIEN, O'ROURKE, HOGAN & MCNULTY, for Claimant.

SAUL WEXLER, for Respondent.

OPINION

JANN, J.

This matter is before the Court on Claimant's complaint for declaratory relief, claiming a total of $191,582.70. Claimant, Illinois Constructors Corporation (hereinafter referred to as ICC), was under contract with the Illinois Department of Transportation (hereinafter referred to as the Department) to build two bridge piers for FA Route No. 412 at the Illinois River near the City of La Salle, Illinois. ICC brought this action pursuant to section 8(b) of the Court of Claims Act (Ill. Rev. Stat., ch. 37,

par. 439.8(b)). At the close of ICC's case in chief, Respondent moved for a directed finding pursuant to section 2—1110 of the Code of Civil Procedure (Ill. Rev. Stat., ch. 110, par. 2—1110). The motion was taken under advisement and the Respondent presented its defense without prejudice to its motion. Oral arguments were heard November 12, 1991.

During excavation for Pier 35 on the north side of the river, ICC encountered difficulties which it claims slowed the progress of the work and resulted in a substantial increase in cost. ICC seeks an equitable adjustment in compensation pursuant to the changed condition provision of its contract. ICC claims that it encountered subsurface conditions that differed materially from the conditions indicated in the contract documents. ICC presents its claim in the following three parts:

(1) $37,330.96 in additional costs for excavating harder material;

(2) $109,054.22 in costs for reinforcing the cofferdam and $21,467.52 for other rental charges associated with extended time for excavation operations; and

(3) $23,730 for the recovery of liquidated damages assessed by the Department.

The Respondent contends that ICC has failed to prove that the conditions it encountered constituted a changed condition as defined by the contract. Respondent maintains that ICC encountered the materials during excavation that it had reason to anticipate based upon the contract documents and pre-bid soil borings.

It is necessary to examine the scope of work required of ICC and determine the conditions actually encountered by ICC. The critical issue is whether the

contract documents provide sufficient notice of the subsurface conditions encountered.

## BACKGROUND—THE CONTRACT

On April 29, 1983, ICC submitted a bid in the sum of $2,675,110.82 in response to the Department's notice to bidders, specifications, proposal, contract and contract bond (hereinafter referred to as the Notice). The work described in the Notice was for "the complete construction of Piers 34 [south] and 35 [north] for the highway bridge over the Illinois River east of La Salle, in La Salle County, Illinois."

On June 1, 1983, the Department accepted the bid by ICC and the parties subsequently entered into a contract for the work. The contract incorporated all provisions of the Notice, the plans for the project and the "Standard Specifications for Road and Bridge Construction" (hereinafter referred to collectively as the Contract).

The principal items of work, as described in the Contract, were for:

(a) the construction and later removal of temporary cofferdam;

(b) the construction, maintenance and later removal of any necessary system of protection for the main river piers during construction, excavation, furnishing and driving steel piles; and

(c) all appurtenant, auxiliary and collateral work necessary for the completion of the substructure.

The contract specified that ICC was to excavate material within the cofferdams to the elevation of 400.5 feet. The base of the seal coat of concrete was to be

poured at that level. The pertinent boring logs indicated that the riverbed was at an elevation of 434.8 feet. ICC therefore needed to excavate vertically 34.3 feet.

The special provisions of the Contract has a section which describes *"WORK NOT INCLUDED IN CONTRACT."* That section specifies:

"Not included are the furnishing, fabricating, erecting and painting of the structural steel for the main span tied arch and the approach span superstructure, approach span piers, abutments, approach pavements, and the construction of the bridge deck."

R.M. Schless, secretary and employee of ICC, testified that in preparing ICC's bid he assumed that the Notice and the Contract did not require any excavation of rock. He also assumed that if rock were encountered, the Department would pay for rock excavation as a changed condition. His assumptions were based on the express exclusion of rock excavation from the scope of work for cofferdam excavation and because the Contract's schedule of prices contained no pay item for rock excavation.

At the time of bidding, Schless believed that ICC could excavate the material in the north cofferdam with soft ground excavating equipment, *i.e.*, pump or clamshell bucket. His belief was based on low recovery rates of rock indicated in the bridge foundation boring logs (boring Nos. B-135 and B-136).

The log for Boring No. B-135 for Pier 35 describes the material at an elevation of 421.8 feet as "[m]edium, light brown, GRAVEL, broken weathered limestone with sand." Boring No. B-136 indicates that "[m]edium to dense, brown, coarse to fine GRAVEL with sand and several 2' layers of weathered limestone" will be found at 422.3 feet. According to B-135, the material at an elevation of 413.8 is "[h]ard, light gray LIMESTONE with weathered limestone pieces, gravel and sand." According

to B-136, "[h]ard, light gray LIMESTONE, with coal and sand in wash water" is at elevation 412.6.

Schless testified that rock is often encountered inside a cofferdam. He knew it was likely that rock would be encountered. He assumed, based upon the boring samples, that the material to be encountered would be loose. He believed the low percentage of recovery stated on the boring logs indicated that the rock was not solid. Because there was not a unit price for rock in the contract he further assumed that the Department would make some adjustments when rock was encountered. Schless stated that he was aware that the Department's engineer was the sole person who would make a determination as to whether rock was encountered. Contrary to his assumptions that the Contract did not require the excavation of rock, Schless also assumed that there was a ledge of limestone.

Work necessary for cofferdam excavation is described in the Contract as follows:

"*COFFERDAM EXCAVATION*: The work under this item includes all foundation excavation, *except rock excavation*, within the limits of the cofferdams, backfilling around the piers to the stream bed elevation, and disposal of excess material. The work shall be done in accordance with the requirements of Section 502 and as specified herein. (Emphasis added.)

Cofferdam excavation shall be measured in cubic yards in place within the cofferdam. The horizontal dimensions shall be the design dimensions of the concrete seal. The vertical dimensions shall be the average depth from the surface of the material to be removed to the bottom design elevation of the concrete seal.

This work will be paid for at the contract unit price per cubic yard for COFFERDAM EXCAVATION, which price shall be payment in full for the above described work."

The Contract provision specifies that the excavation work "includes all foundation excavation, except rock excavation, within the limits of the cofferdam." It specifies that the work shall be done in accordance with the requirements of section 502 of the standard specifications

for road and bridge construction (hereinafter referred to as Standard Specifications). The pertinent provisions of section 502 of the Standard Specifications state:

"Section 502.3 General.

\* \* \*

COFFERDAM EXCAVATION, when specified, shall include all excavation within the limits of a cofferdam, except rock excavation.

\* \* \*

Rock Excavation for Structures shall consist of the excavation of boulders ½ cubic yard in volume or greater and all rock in ledges, *bedded deposits* and *conglomerate deposits so firmly cemented as to present all the physical characteristics and difficulty of removal of rock as determined by the Engineer.* After the Engineer has made the determination that the material qualifies as rock excavation, the Contractor may use any method he chooses including ripping to remove the rock excavation." (Emphasis added.)

"502.16 Basis of Payment.

\* \* \*

Structure Excavation and Cofferdam Excavation, when specified, will be paid for at the contract unit price per cubic yard for STRUCTURE EXCAVATION and COFFERDAM EXCAVATION, measured as specified herein\* \* \*

When material classified as Rock Excavation for Structures is encountered and [ ][w]hen the contract does not contain a unit price for Rock Excavation for Structures, *it will be paid for as extra work in accordance with Article 109.04.*" (Emphasis added.)

The provisions refer to section 109.04 when rock excavation for structures is encountered and there is no unit price for rock excavation.

Section 109.04 of the Standard Specifications states that the extra work will be paid at a price agreed upon by the contractor and the Department's engineer or on a force account basis.

Mr. Cecil Gatewood, the Department's resident engineer, testified that he did not participate in the preparation of the bidding documents and could not explain why

there was no pay item for rock excavation. He stated that work performed without a pay item would be paid under a force account basis, as was done in this instance.

## SUBSURFACE CONDITIONS ENCOUNTERED

A geotechnical engineer hired by ICC, Safdar A. Gill of STS Consultants, Ltd., prepared two alternative designs for the cofferdams, labeled Scheme A and Scheme B. In so doing, he reviewed the boring logs. Scheme A assumed the steel sheeting could be driven below the base of the seal coat of concrete to elevation of 400.5 (feet above sea level). Scheme B assumed that the sheeting would meet refusal at the limestone shown in boring logs, at elevations of approximately 413.8 and 412.6 feet.

Two test piles were driven by ICC at the site on June 17, 1983. One pile met refusal at elevation 409±. Both test piles encountered high blow counts between elevations 416 and 411. Gill concluded that Scheme A would not be feasible. ICC decided to construct the cofferdam utilizing Scheme B which required driving the sheeting as deep as possible and stabilizing them with internal bracing. The sheeting would not, under Scheme B, be driven as deep as the base of the pier foundation. The cofferdam was built oversized to provide for a three-foot ledge of limestone inside the face of the sheeting. ICC presumed there was a ledge of limestone which would sustain the sheeting.

ICC submitted the Scheme B design to the Department on July 23, 1983, pursuant to section 502.07 of the Standard Specifications. That section provides that such submission to the Department shall not in any way relieve the contractor of his responsibility to secure a safe and satisfactory cofferdam. The Department notified ICC

that the Pier 35 cofferdam drawings were found to be adequate.

When ICC began driving the steel sheeting for the north cofferdam it met refusal near the elevation of 413 feet, as it had anticipated. After construction of the cofferdam pursuant to the Scheme B design, ICC began excavating the area within the cofferdam in the wet with a dredge pump. ICC contends that it began excavating operations on June 27, 1984. Claimant's Exhibit No. 28 reveals that actual excavation of material began on July 11, 1984. The top 10 feet of material below the riverbed were pumped out with a dredge pump.

When excavation reached elevation of 425 feet, harder material was encountered and the dredge pump was not effective. ICC began digging the harder material with a clamshell bucket. The clamshell bucket weighed at least 9,000 pounds, had hardened steel teeth at least eight inches long and was specifically designed for hard digging. When ICC reached the elevation of 422 feet to 420 feet, the clamshell bucket was not effective.

On July 13, 1984, ICC sent a letter to the Department advising it that bedded deposits and conglomerate deposits were encountered in the Pier 35 cofferdam. ICC stated that the deposits were so firmly cemented that they presented all the physical characteristics and difficulty of removal of rock.

Although the July 13 letter states that it is given in accordance with article 104.04 (changed conditions) and with article 104.03, C.3 (extra work requiring a change in type of construction), the letter does not state that the conditions encountered differ materially from those indicated in the contract. Instead ICC expressed that it wished "to alert the engineer that this work (cofferdam

excavation) now requires a change in type of construction and the *conditions materially differ from those previously encountered* and cause an increase in cost and time required for performance of the work." (Emphasis added.) ICC also expressed that the work was beyond the scope of the cofferdam excavation and the equipment would "be placed on standby until an authorization is received from the engineer to proceed under a force account basis or at an agreed unit price for rock excavation."

On July 16, 1984, all excavation efforts at Pier 35 stopped. On July 16, 1984, the Department hired a professional diving company, Pro Dive, Inc., to conduct an underwater inspection of the Pier 35 cofferdam. Pro Dive submitted a report to the Department two days later chronicling its observations. Pro Dive observed

"The bottom was found to consist of rocks and sand tightly compacted together. The majority of rocks ranged in size from gravel up to about 18 inches in diameter. Some rocks were thought to be larger but ° ° ° were still partially buried in the bottom. With a probe the diver excavated one such rock and it was 8 inches in diameter ° ° ° the crane operator was requested to drop the clam bucket to the bottom. Inspection revealed that the teeth of the clam bucket penetrated the bottom material about 4 inches."

On July 17, 1984, the Department sent a letter to ICC directing it to proceed with the excavation of the north cofferdam. The letter stated that the matter was reviewed in the field by representatives of the Department and the material was investigated under water by a diver. The letter states

"The findings of this investigation indicate that the deposits are not cemented and should not be classified as rock excavation with the exception of the isolated boulders measuring one-half cubic yards or greater in volume."

The July 17 letter concluded that the material encountered is consistent with that indicated in the boring logs and is not considered a changed condition. The Department stated that it would pay for excavation of boulders

in accordance with article 109.04 (payment for extra work).

On July 20, 1984, STS Consultants, Ltd., wrote to ICC describing methods that could be utilized to remove the material from the north cofferdam. Without making an actual inspection of the material in place, STS stated that

"Based upon observation of spoil areas, it appears that the material being removed from the cofferdam consists of cobbles and boulders within a matrix of sand and silt. This conglomeratic soil is apparently interlocked material as indicated by the apparent density and apparent lack of material recovery during the clamshell operations."

The July 20 letter concludes with the notation that the "in-place material appears very dense and exhibits behavior similar to 'rock'."

On July 23, 1984, ICC resumed excavation operations using a high pressure water jet to loosen material so that it could be removed by the clamshell bucket. Also on July 23, 1984, legal counsel on behalf of ICC sent a letter to the Department stating that ICC would record its costs in accordance with the "force account" described in article 109.04 of the Standard Specifications, unless some other arrangement was negotiated. There is no evidence of any other arrangement being negotiated.

On July 27, a second shift was added at Pier 35 and ICC extended the work week to six days. A third shift was added on August 2.

## DAMAGES CLAIMED

ICC's three-part claim totals $191,582.70. In relation to the first part, ICC claims it expended at least $355,433.14 to excavate material from elevation 422± to 407 and sent an invoice to the Department on February 7, 1985. ICC claims to have credited to the amount

$34,525.20 for the volume of material within the pay limits of the seal coat excavation and credited the $283,576.98 the Department paid ICC on a force account basis for rocks exceeding ½ cubic yard in volume, leaving a balance claimed due of $37,330.96 in dispute.

In the second part of its claim, ICC argues that it expended $109,054.22 on labor, materials and equipment to reinforce the north cofferdam between September 25 and October 11, 1984. ICC also claims $21,467.52 in rental charges resulting from the extended time for performance through the end of November 1984. The charges are for three items. First, $5,951.36 in steel sheeting rental charges. Second, $8,475 in coffing hoist rental charges from August 14 to September 18, 1984, which were used to support the cofferdam waters until they were lowered into position. ICC added a 5% markup for administrative costs. Third, ICC furnished 192 tons of steel bracing from its stock piles and charged rental. ICC also adds a bond cost fee of 1.2% for the three items.

The third part of the claim relates to ICC's request for the return of monies withheld pursuant to the liquidated damage provision of the Contract. ICC only allotted 15 working days for excavation of the cofferdams in its July 2, 1984, progress schedule. The Department ultimately assessed liquidated damages in the sum of $23,730 for an overrun of 56.5 working days on the project. The Contract provided for all pier work to be accomplished within 190 working days. All contract work was completed in 267½ working days. The Department authorized, to the benefit of ICC, an extension of 21 days: 10 working days used to drive and splice 32 additional pilings on Pier 35, and 11 working days for additional piling driven on Pier 34. The total approved working days for

the contract were thereby increased to 211 working days, leaving an overrun of 56.5 working days.

Schless contends that the Department, through Cecil Gatewood, the engineer for the project, agreed to an extension of time so that no liquidated damages would be assessed. No documents or exhibits in the record demonstrate that any extension was granted. Gatewood denied that he agreed to an extension of time. Schless admitted that Gatewood did not have the authority to extend the time and such extensions were governed by a procedure described in section 109.04 of the Standard Specifications.

## RESPONDENT'S MOTION FOR DIRECTED FINDING

The Respondent contends that no changed condition existed and ICC encountered those materials which it had reason to anticipate from the contract documents. The Respondent states that the boring logs were made available to Claimant prior to its bidding. Respondent also notes that ICC decided on the design of the cofferdam and the material used in its construction.

Respondent contends that ICC treated the excavation of boulders in excess of ½ cubic yard on a force account basis. Respondent asserts that it did equitably adjust the Contract by paying Claimant $283,576.98 for rock excavated within the north cofferdam, $35,901.71 for additional pile splicing, and $34,525.20 for additional cofferdam excavation.

The theory of this claim is basically that all money sought is due Claimant because it encountered a changed condition. ICC appears to be arguing that there were two changed conditions. ICC claims that at an elevation of

422 feet it encountered material that met the definition of rock and was too hard to be excavated, and then claims that at 413 feet the material was not hard enough to sustain the cofferdam sheeting which caused a cave-in and additional costs for work and equipment.

In determining whether to grant a motion for a directed finding, the motion should be granted if the evidence, when viewed in its aspect most favorable to the nonmoving party, so overwhelmingly favors movant that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill.2d 494, 229 N.E.2d 504.) In this case one of the more compelling issues is the effect of the express exclusion of "rock excavation" from the scope of work for the cofferdams. Because there is evidence that a "harder material" was encountered, that express exclusion alone should result in the ruling that the evidence, when viewed in its aspect most favorably towards Claimant, does not overwhelmingly favor Respondent so that no contrary verdict could ever stand. In relation to Respondent's motion for a directed finding, the motion is denied.

## MERITS OF THE CLAIM

A ruling on the motion is not dispositive of this matter. The distinction between ruling on the motion and determining liability is that the Court may consider Respondent's evidence and may employ a different burden of proof to the interpretation of the evidence. In determining the issue of whether ICC encountered a changed condition, the Court must determine if the conditions encountered were sufficiently indicated in the Contract documents. *Foster Construction v. United States* (Ct. Cl. 1970), 435 F.2d 873.

The first consideration is whether the express exclusion of rock excavation, from the description of work necessary for cofferdam excavation, indicates that the Department did not anticipate that rock would be encountered. The determination of whether the Contract indicated the conditions encountered is a question of law. (*United Contractors v. United States* (Ct. Cl. 1966), 368 F.2d 585.) The Court finds that the Department anticipated, and the Contract indicated, that a contractor would encounter boulders in excess of ½ cubic yard in volume and encounter the rock conditions indicated in the boring logs. The Contract includes a provision that specifically states what work is not included in the Contract but that provision does not exclude rock excavation. The Contract does not indicate that boulders, or other rock fragments, would not be encountered. Boring samples clearly indicated the contrary. The express exclusion of rock excavation from the description of work for cofferdam excavation, when interpreting the contract as a whole, merely related to the manner and method of payment for the work described.

Although it is a question of law, not one of fact, the Claimant still has the burden of proving its right to recovery and has a burden of demonstrating what conditions were actually encountered. This is the weakness of Claimant's case. The Court cannot compare the Contract "indications" to the material encountered if it does not know what was actually encountered.

The Court finds that the Claimant has not proven that all of the material encountered at, and below, the elevation of 422 feet meets the definition of rock. This finding in no way relates to the encountering of boulders measuring ½ cubic yard or greater. ICC did encounter boulders measuring ½ cubic yard or greater. ICC has

failed to prove that *all* of the material in question was "bedded deposits" or "conglomerate deposits so firmly cemented as to present all the physical characteristics and difficulty of removal of rock" as defined by section 502.03 of the Standard Specifications.

ICC alleges that the material presented all of the physical characteristics and difficulty of removal of rock, but fails to prove it. According to Claimant, Pro Dive called the material "rocks and sand tightly compacted together," and the Department's geologist called it "sandstone, limestone and dark color igneous rocks embedded in fine sand and organic silty loam." ICC then poses the question as to whether these descriptions meet the definition of rock excavation as described in section 502.03 of the Standard Specifications. The descriptions do not prove that conditions actually encountered are "bedded deposits so firmly cemented as to present all the physical characteristics and difficulty of removal of rock." ICC maintains that whether the material meets the definition of rock depends on the latent properties of the material. At oral argument Claimant's attorney admitted that the material encountered was not geologically classified as rock.

ICC's argument is that the material was as difficult to remove as rock would be, and therefore that proves it was rock. This is insufficient to prove the degree of difficulty of removal. It is also insufficient to prove the latent properties of the material, without evidence that ICC employed the proper method and equipment for removal.

This case is distinguishable from *Shank-Artukovich v. United States* (1987), 13 Ct. Cl. 346, heavily relied upon by ICC. The *Shank-Artukovich* court found that the

government's own evidence, *i.e.* daily inspection reports, supported the contractor's position. 13 Ct. Cl. at 351.

There is little merit to the argument that the fact ICC had to employ different construction methods demonstrates that the conditions encountered differed materially from conditions indicated in the Contract. Claimant did not demonstrate the actual conditions it encountered and, therefore, the record does not indicate which construction methods were proper for the conditions encountered. *Kenny Construction Co. v. Metropolitan Sanitary District of Greater Chicago* (1971), 52 Ill. 2d 187, 288 N.E.2d 1, cited by ICC, involved the construction of a tunnel and there was a detailed record which the circuit court relied upon in holding that there were changed conditions. The record detailed methods used by the contractor and discussions between the parties that ultimately led to the circuit court finding that the "District had waived and was estopped" from denying extra compensation. In the *Kenny* case, as well as the other cases cited by Claimant, the courts never held that different construction methods proved there was a changed condition. *Fattore Co. v. Metropolitan Sewer Commission of Milwaukee* (7th Cir. 1971), 454 F.2d 537, *cert. denied,* 406 U.S. 921, and later *appealed* (7th Cir. 1974), 504 F.2d 1; *Fehlhaber Corp. v. United States* (Ct. Cl. 1957), 151 F. Supp. 817, *cert. denied,* 355 U.S. 877.

We rely on the following factors which support Respondent's position: the lack of evidence proving the actual conditions encountered, the lack of evidence showing that the use of equipment and methods were proper, the absence of testimony from a witness that observed the material in place, the absence of testimony from an expert that the material met the definition of rock, the opinion of the Respondent's geologist that "conglomerate

rocks so firmly cemented" to meet the definition of rock would not lose their cementation upon excavation, as the material did in the case at bar, the glaring inconsistencies in ICC's claim that everything below 424 to 422 feet met the definition of rock even though the limestone at approximately 413 would not sustain the sheeting, and the description of conditions contained in the August 15, 1984, STS Consultants, Ltd., letter to ICC, wherein Gill wrote to the effect that he is doubtful that a 12-foot vertical cut can be maintained below the elevation of 413± feet, and had rock existed below elevation of 413± feet, then the vertical cut could have been sustained.

The Court finds that the encountering of boulders ½ cubic yard or greater is not a changed condition in this Contract. The potential existence of such boulders was indicated in the Contract and would reasonably be anticipated, as admitted by ICC, when conducting subsurface operations in the Illinois River Valley. Section 502.16 of the Standard Specifications specifies that when "a Contract does not contain a unit price for Rock Excavation for Structures, it will be paid for as extra work in accordance with Article 109.04." Therefore, the contract anticipated a method of payment for the removal of the boulders.

ICC elected to receive payment for removal of boulders on a force account basis pursuant to the Contract. On February 7, 1985, ICC billed $439,675.55 for rock excavation from elevation 424± feet to elevation 407± feet. The Claimant's exhibit indicates that approximately 381 cubic yards of rock were removed. The Department found that only 341.8 cubic yards were removed from within the pay limits and agreed to pay $286,178.56 for rock excavation. On May 15, 1985, ICC submitted a bill in the sum of $287,000 for rock excavation, without waiving its claim for further reimbursement for claimed sums.

In late 1985 and early 1986, the parties exchanged correspondence regarding adjustments to the bill for excavation within the cofferdam and finally reached an agreement on it. The additional $37,330.96 sought by ICC for excavation appears to be for excavation of material outside the pay limits. Wherefore, ICC's claim for the additional sum of $437,330.96 is hereby denied.

It is not necessary to examine the part of the claim relating to the stabilization of the north cofferdam. The Court finds that there was not a changed condition. The boring logs indicate that limestone would be encountered, but in no way indicate that a ledge of limestone sufficient to support the cofferdam sheeting existed. ICC had the responsibility for the safety, stability, or adequacy of sheet piling and bracing, and was to be solely responsible and liable for all damages resulting from the failure or inadequacy of the cofferdam. This responsibility exists regardless of the Department's approval of ICC's proposed cofferdam design.

The Court further finds that ICC failed to prove that there was an agreement between the parties on waiving liquidated damages. ICC acknowledged that the method of approving an extension requires such extensions to be in writing, but provided no documentation to prove such. The failure of ICC to prove that changed conditions were encountered also works to defeat any claim to equitably adjust the deadlines.

The general rule is that the contractor is bound by the damage provisions of the contract and has no right to additional compensation for delays which prevent the contractor from completing the contract unless the delays are the sole responsibility of the State. (*Johnson County Asphalt v. State* (1987), 39 Ill. Ct. Cl. 36, citing *Walsh*

*Construction Co. v. State* (1964), 24 Ill. Ct. Cl. 441.) If delays are caused by the State, including delays resulting from bid plans and specifications prepared in error by the State, then the contractor is entitled to damages for his increased costs resulting from the delays. (*Ezizii Electric, Inc. v. State* (1978), 32 Ill. Ct. Cl. 93; *Warchol Construction Co. v. State* (1979), 32 Ill. Ct. Cl. 679.) Claimant has failed to prove that it encountered a changed condition within the parameters of the Contract which it asserts resulted in delays and additional expenses. Claimant has further failed to provide evidence of the State's culpability in causing delays.

Wherefore, it is hereby ordered that

1. Respondent's motion for a directed finding is denied.

2. Claimant's claim is hereby denied on all counts.