(No. 96-CC-2899–

JAMES CAPE & SONS CO., Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed March 23, 2000.*

*Order filed April 6, 2000.*

CALLAHAN, FITZPATRICK, LAKOMA & McGLYNN (MATTHEW W. LAKOMA, of counsel) and JENKINS & GILCHRIST (TERRY GORMAN, of counsel), for Claimant.

JIM E. RYAN, Attorney General (TOMAS A. RAMIREZ, Assistant Attorney General, of counsel), for Respondent.

## OPINION

FREDERICK, J.

This cause comes before the Court on Claimant, James Cape & Sons Co.'s, verified complaint against Respondent, State of Illinois. The Court's jurisdiction is pursuant to section 8(b) of the Court of Claims Act. (705 ILCS 505/8(b) (1996).) The complaint includes nine counts with a combined prayer seeking an award of $1,870,747.69 for damages allegedly incurred by Claimant arising out of the performance of highway construction contract no. 86399 (hereinafter referred to as "contract") between Claimant and the Department of Transportation (hereinafter referred to as "IDOT"). Claimant was awarded the contract on its bid of $10,593,467.22 for the construction of improvements to F.A.I. Route 80 in Grundy County. The work included the removal of existing pavement, recycling existing pavement into sub-base shoulders, subgrade preparation, and reconstruction of 6.25 miles of continuously reinforced Portland cement concrete pavement with Portland cement concrete shoulders for Interstate 80 located between Seneca and Morris, Illinois.

The contract required completion of most of the work and that the roadway be reopened on or before October 30, 1993. The contract included two provisions, one being an assessment of liquidated damages against Claimant in the amount of $15,000 per day for each day after October 30, 1993, that the work was not completed, and the other being an incentive payment plan for payments to Claimant in the amount of $15,000 per day for each day, not to exceed 30 days, that the work was completed on or before October 30, 1993. The roadway was opened to traffic on October 27, 1993.

Claimant alleges that certain events, as listed in paragraph 16 of its complaint, cumulatively acted to increase the Claimant's cost to perform the work by $1,870,747.69 and delayed opening of the roadway by 64 days. A summary of the nine-count complaint with a breakdown of alleged damages is as follows:

* Count I–$6,549.88 for direct costs of expanded traffic control;

* Count II–$42,227.67 for direct costs to perform additional lime modified soils;

* Count III–$477,429.19 for direct costs to perform earth excavation (special);

* Count IV–$12,254.01 for additional cement in drainage layer;

* Count V–$24,200 for additional quantity of drainage layer material;

* Count VI–$127,390.50 for width, depth and deductions for mainline concrete pavement;

* Count VII–$19,126.99 for improper rejection of pavement under Nettle School Road;

* Count VIII–$260,136.27 for direct costs of abnormally and unusually severe weather; and

* Count IX–$901,244.88 for acceleration and delay costs.

The cause was tried by our Commissioner in a three-day trial which was conducted February 9-11, 1998.

On February 9, 1998, the "Narrative Section," pages 11-42 of the departmental report (of the report volume), was ruled to be inadmissible pursuant to section 790.140 of the Court of Claims Regulations. (74 Ill. Adm. Code 790.140.) The exhibits volume of the departmental report was not affected by this ruling and all exhibits offered by Respondent as a part of the departmental report were admitted into the record. Respondent filed its motion to reconsider and vacate the ruling and Claimant filed a response. Oral arguments on the motion were held. Claimant's post-hearing memorandum was filed on October 15, 1998. On February 23, 1999, the Court entered an order denying respondent's motion to reconsider and vacate.

At trial, Claimant presented four witnesses. The witnesses were: William Robert Cape, president and a stockholder of Claimant; James Sponem, an employee of Claimant during the bidding and work on the contract; Stanley E. Grabski, a project review engineer for IDOT; and Richard Ott, president of TransCon Consulting, a construction management consulting firm, who was Claimant's opinion witness.

The Respondent presented five witnesses. They were: Wayne Lyle Phillips, a physical test engineer for IDOT; Dan L. Mestelle, construction engineer for IDOT at the time of the contract; Ken R. Lang, area-supervising engineer for IDOT during the Claimant contract; Chris Manor, project manager for Claimant during the project; and Stanley E. Grabski.

William Cape was presented by Claimant as a witness in rebuttal. The trial record also consists of numerous documents. Both parties have filed briefs; however, neither party cited any case authority.

## The Facts

Contract no. 86399 was advertised in the department service bulletin dated December 11, 1992, for letting to be held on January 8, 1993. Prior to formal advertisement, the department held a pre-bid conference on November 16, 1992, in order to provide advance information to potential bidders about the work to be performed.

Claimant is a Wisconsin corporation that has been engaged in the construction industry since the 1880s. Claimant is experienced in concrete paving and reconstruction, but also performs earthwork, concrete crushing and building construction. Prior to this contract, Claimant had worked on 15 to 20 interstate reconstruction projects throughout the country.

The contract was subject to the standard specifications for road and bridge construction adopted July 1, 1988 as supplemented pursuant to the contract check sheet for supplemental specifications and recurring special provisions adopted December 2, 1991. The contract includes the plans and special provisions.

The project was to be accomplished in two stages. The eastbound lanes of I-80 would be diverted onto the westbound lanes in a two-way, two-lane pattern. Traffic diverted would cross over by means of a temporary roadway between the eastbound and westbound lanes. The reverse process would later direct westbound traffic into the eastbound lanes by means of a second temporary cross-over.

The contract was established on February 16, 1993, when IDOT accepted and executed the contract. The

special provisions provided for a completion date of October 30, 1993, and advised the contractor that said completion date was based on an expedited work schedule. The special provisions provided for liquidated damages of $15,000 for each day beyond October 30, 1993, during which the work remained incomplete and allowed for incentive payment in the same amount for each day of early completion up to 30 days.

A portion of the special provisions provides, in part:

"Should the contractor be delayed in the commencement, prosecution or completion of the work for any reason, there shall be no extension of the incentive payment calculation date even though there may be granted an extension of time for completion of the work unless significant extra work is added to the contract by the Department."

Article 108.09(b) provides that timely completion is an essential element of the contract and defines the circumstances allowing for an extension of the completion date:

"108.09 Determination and Extension of Contract Time.

* * *

(b) Completion Date. When a completion date is specified, it is understood that time is of the essence and that completion of the work by that date is an essential part of the contract. The Contractor's plea that insufficient time was specified is not a valid reason for extension of time.

When a delay occurs due to unforeseen causes beyond the control and without fault or negligence of the Contractor, including, but not restricted to, acts of God, acts of the public enemy, governmental acts, fires, epidemics, strikes; extraordinary delays caused by utilities or Railroad; extraordinary delays in delivery of materials caused by strikes, lock-outs, wrecks, freight embargoes, governmental acts, inability to procure critical materials and work added to the contract which affects progress on the controlling item, the time of completion shall be extended in whatever amount is determined by the Department to be equitable.

An 'Act of God' means an earthquake, flood, cloudburst, tornado or other phenomena of nature beyond the power of the Contractor to foresee or to make preparation in defense against. A rain, windstorm or other natural phenomenon of normal intensity, based on U.S. Weather Bureau reports for the particular locality and for the particular season of the year in which the work is being prosecuted, shall not be construed as an 'Act of God' and no extension of time will be granted for the delays resulting therefrom. No extension

of time will be granted for any delay or suspension of the work due to the fault of the Contractor. No extension of time on account of a delay due to unforeseen causes will be granted if written application therefore is not filed by the Contractor with the Department setting forth the reasons which the Contractor believes will justify the approval of his/her report.

After the Contractor has filed a request for an extension of time, the Department will notify the Contractor, in writing, whether or not such extension will be approved. If approved, the extended date for completion shall then be considered as in effect the same as if it were the original date for completion."

The contractor completed all work subject to the completion date and began earning the incentive payment on October 27, 1993. The total adjusted value contract payments for this project was $11,032,904.47 after accounting for all added and delayed functions.

The contract contained the special provision for contract claims which provides the requirements to be applied and procedures to be followed in circumstances where the contractor claims that additional payment is due. The contractor filed its two-volume claim for equitable adjustment in accordance with the special provision on November 1, 1994.

The special provision for contract claims governs and limits the type of costs recoverable under the terms of the contract for any claim for additional compensation. In part, the special provision states:

"Full compliance by the Contractor with the provisions of this Special Provision is a contractual condition precedent to the Contractor's right to seek relief in the Court of Claims. The Director's written response shall be deemed a final action of the Department. Unless the Contractor files a claim written response, the failure to so file shall constitute a release and waiver of the claim. The Basis of Payment established in the Special Provision is an essential element of the contract and the claim cost recovery of the Contractor shall be so limited.

Basis of Payment
After resolution of any claim in favor of the Contractor, an equitable adjustment in accordance with the following limitations will be made:

1. Any adjustment in the time required for the work shall be in accordance with Section 108 of the Standards Specifications.

2. Any adjustment in the costs to be paid shall be made on the following basis:

(a) Direct labor.
(b) Direct materials.
(c) Direct equipment.
(d) Direct job site overhead.
(e) Direct offset overhead.
(f) Other direct costs allowed by the resolution.

3. Adjustments in costs will not be made for the following items:

(a) Interest charges.
(b) Loss of anticipated profit.
(c) Undocumented loss of efficiency.
(d) Prorate home office overhead.
(e) Unabsorbed overhead and lost opportunity.
(f) Preparation of claim expense.
(g) Other consequential, indirect costs regardless of method of calculation."

## CLAIMANT'S ARGUMENT

Claimant argues that it is entitled to an award of $1,870,747.69. Interstate 80 was to remain open throughout the completion of the work (with traffic shifted to only two lanes, in a head-to-head configuration), therefore, it was imperative that the work be completed prior to October 30th of that same year. The likelihood of deteriorating fall and winter weather conditions occurring after the end of October would create significant safety risks to the traveling public. The contract includes the following three special provisions to have the work completed prior to October 30, 1993:

"a. Instead of a specified number of 'working days' that would be monitored and assessed by IDOT during the Project, a 'Completion Date' was set of October 30, 1993;

b. For each day after October 30, 1993, that the work was not completed ('Liquidated Damages Deadline'), IDOT would assess a penalty of $15,000 per day without a limit or cap on the amount that could be assessed; and

c. For each day prior to October 30, 1993, that the work was completed, Cape would be paid an extra $15,000 ('Incentive Payment Deadline'), up to a maximum of 30 days."

To account for unexpected events and matters outside the control of the contractor, the contract includes the following two extension provisions:

"a. The Liquidated Damages Deadline would be extended beyond October 30, 1993, for events described in Art. 108.09(b) of the Specifications, which included:

delays due to causes beyond the control and without the fault or negligence of the contractor, *INCLUDING ACTS OF GOD*, AND WORK ADDED WHICH AFFECTS PROGRESS ON THE CONTROLLING ITEM. [emphasis added]

Acts of God included amounts of rain above normal historical levels.

b. The Incentive Payment Deadline would be adjusted if IDOT added 'Significant Extra Work' to the contract."

Claimant began the work in March, 1993. Despite significant extra work added by IDOT, despite rainfall much heavier than historical norms, and despite IDOT's intentional noncompliance with the contract specifications and industry practices, Claimant substantially completed the work on October 27, 1993, three days ahead of the completion date.

Although Claimant substantially completed the work prior to the completion date, Claimant incurred over $3 million in additional and unreimbursed costs in doing so. Significant extra work was added by IDOT, abnormally heavy rainfall fell throughout the duration of the work, and IDOT failed to comply with contract specifications and industry practices. In addition to not reimbursing Claimant for the costs related to the foregoing, IDOT refused repeated requests by Claimant to extend the liquidated damages deadline and the incentive payment deadline. Faced with the prospect of unlimited liquidated damages, Claimant accelerated its efforts beyond what was required by the contract. While IDOT continually assured Claimant that Claimant's additional costs would be reimbursed, IDOT disavowed all prior assurances once substantial completion of the work was achieved.

Claimant's Entitlement to $525,206.63 in Direct Costs Resulting from Significant Extra Work Added by IDOT

Claimant argues that $526,206.63 is due to Claimant as a result of direct costs caused by significant extra work added to the project by IDOT after the contract was entered.

Count I: Unpaid Direct Costs of Significant Extra Work Added by IDOT to Traffic Control

Throughout the completion of the project, Claimant was required to perform various traffic control functions. The contract required that as one side of Interstate 80 was under construction, the traffic would be diverted to the remaining open two lanes of the interstate, in a head-to-head configuration. The head-to-head traffic would be separated only by a painted yellow strip in the middle of the roadway. However, as early as December 2, 1992 (which was prior to IDOT's bid announcement for the project), IDOT had internal concerns that its planned traffic control was putting the traveling public at risk. The evidence indicated an IDOT memorandum sent directly to the district engineer, Ralph Dalton, which stated: "Do you still want to go without concrete barriers? Looks to me like we're waiting for an accident to happen."

Despite IDOT's own internal concerns about the apparent inadequacy of the planned traffic control measures, IDOT issued the contract plans without any traffic control enhancements.

After the contract had been executed by Claimant and IDOT, and after Claimant was approximately one month into its construction of the project, at the end of March, 1993, IDOT announced significant additions to the traffic control requirements. In part, the changes in the traffic control included:

"a. The installation of pavement box reflectors and flexible delineators (with reflective tape) every fifty feet of the roadway;

b. Crash attenuators;

c. Approximately 750 linear feet of additional concrete barrier wall;

d. The relocation of temporary light poles;

e. The placement of guardrails protecting such light poles;

f. Temporary raised pavement markers, type II;

g. Ongoing maintenance throughout the project of the flexible delineators;

h. Ongoing maintenance throughout the project of the raised pavement markers;

i. Removal of all such added items at the completion of the work; and

j. The extension of the planned tapers for the crossovers."

All of the above-referenced significant extra work was added at the instruction of IDOT and was not necessitated by any acts or omissions on the part of Claimant.

IDOT reimbursed Claimant for many of the direct costs resulting from the changes in the traffic control; however, $6,549.87 in direct costs to Claimant remain unpaid. The significant extra work also caused unexpected delays in Claimant's construction of the project.

Count II: Unpaid Direct Costs of Significant Extra Work Added by IDOT to Complete Additional Lime Modification of Soils

As set forth by IDOT in the contract for the project, after the removal of the existing roadway and after the excavation of the subgrade, lime was to be added to the depth of 12 inches into the base soils. By adding lime to a 12-inch depth, the base soils would be "stabilized" sufficient to support the new roadbed that was to be constructed.

As Claimant proceeded with the work, it became apparent that lime needed to be added to an additional four-inch depth in order to stabilize the base soils. IDOT instructed Claimant to add the additional four-inch depth

of lime to relatively small areas, and Claimant was reimbursed for its additional efforts. Subsequently, IDOT instructed Claimant to add the additional four-inch depth to ever-increasing locations. The result was that significant extra work was required by Claimant that was not in the contract. Claimant's unreimbursed direct costs caused by the additional lime requirements total $42,227.67. The significant extra work also caused unexpected delays in Claimant's construction of the project.

Count III:  Unpaid Direct Costs of Significant Extra
Work Added by IDOT to Complete the Earth Excavation

The contract for the project contained drawings that identified the elevation of the center grade line for each side of Interstate 80. Claimant calculated the amount of soils that would have to be excavated and removed from the existing roadbed.

As Claimant began to excavate and remove the existing roadbed, it became apparent that the IDOT elevation data was flawed, resulting in Claimant having to excavate and remove a far greater amount of soil than had been set forth in the contract. Claimant's removal of the additional soil resulted in significant extra work by Claimant, necessitated by the poor data provided by IDOT.

During the project, IDOT rejected Claimant's requests related to the cost of the additional extra excavation and continued to assert that its elevation data in the contract was correct. IDOT subsequently completed a detailed cross-section of the westbound lanes of Interstate 80. When compared to the drawings in the contract, the resulting cross-section confirms that the contract elevation data was flawed.

Claimant's unreimbursed direct costs caused by the significant extra work resulting from the flawed contract

elevation data total $477,429.09. The significant extra work also caused unexpected delays in Claimant's construction of the project.

Claimant's Entitlement to $260,136.27 in Direct Costs Resulting from Abnormal and Unusually Severe Weather

$260,136.27 is due Claimant as a result of direct costs caused by abnormal and unusual weather conditions during the project.

From March, 1993, through October, 1993, the project site was subjected to heavy and prolonged rainfall, far above historical norms. Based on IDOT's own compiled weather data, abnormally heavy rainfall occurred during March, April, June, July, August and September. IDOT's service bulletin noted that 1993 was a year of heavy, prolonged rainfall with flooding.

Claimant's direct costs (including additional labor and material costs and costs related to additional maintenance of the dirt haul roads) sustained as a result of the Act of God level of rainfall total $260,136.27, none of which has been reimbursed by IDOT. The Act of God level rainfall also caused unexpected delays in Claimant's completion of the project.

Claimant's Entitlement to $496,213.19 in Acceleration and Delay Costs

$496,213.19 is due as a result of acceleration and delay costs necessitated by the foregoing described significant extra work, abnormal Act of God weather, and IDOT's continued refusal to grant Claimant extensions of the liquidated damages deadline.

The contract provided that the liquidated damages deadline was to be extended for delays caused by significant

extra work[1] and unusually heavy rainfall (deemed to be an Act of God). IDOT repeatedly refused Claimant's requests to extend.

Claimant lost 35 days due to significant extra work added by IDOT and an additional 29 days due to abnormally heavy, Act of God rainfall. With IDOT's improper refusal to extend the liquidated damages deadline and the threat of liquidated damages, Claimant was faced with the prospect of assessments totaling upwards of $1 million. To avoid such assessments, Claimant had no choice but to accelerate its efforts well beyond what was required by the contract. The result was $496,213.19 in additional costs that remain unpaid and would not have been incurred by Claimant had IDOT properly extended the liquidated damages deadline.

Claimant's Entitlement to $405,000 in Additional Incentive Payments

$405,000 is due in unpaid incentive payments. Simultaneous with IDOT's improper use of the liquidated damages deadline, IDOT also chose to ignore the contractual ground rules relating to the incentive payment deadline. While the contract provides that the incentive payment deadline would be adjusted to reflect delays caused by significant extra work, IDOT repeatedly refused Claimant's request to make such adjustment.

Throughout the project, Claimant suffered a delay of 35 days due to the IDOT addition of significant extra work. After deducting the three days of incentive payment that Claimant did receive and after accounting for the 30-day cap for incentive payments, the result is that

---

[1] This is Claimant's characterization of the contract language. Article 108.09(b) states, "° ° ° work added that affects progress on a controlling item," and does not state "significant extra work."

Claimant was improperly denied 27 days of incentive payments. At $15,000 per day, Claimant is owed $405,000 in incentive payments.

Claimant's Entitlement to $183,191.81 in Costs Resulting from IDOT's Noncompliance with Contract Specifications and Industry Practices

$183,191.81 is due as a result of IDOT's noncompliance with terms and conditions of the contract and IDOT's failure to comply with industry practices.

Count IV: Additional Cement in Cement Layer

The specifications for the project require that the open-graded base course have a cement content of no less than 200 lbs/cy and no greater than 280 lbs/cy. In accordance with the contract, Claimant announced its intention to use a cement content of 200 lbs/cy. However, IDOT directed that Claimant use a much higher content of cement. As a result of IDOT's excessive demands, Claimant incurred an additional $12,254 in costs that have not yet been paid.

Count V: Additional Quantity of Drainage Layer Material

The specifications for the contract also provide that Claimant would be compensated for the total volume of material laid in the required areas of the drainage layer for the new roadway. Despite Claimant's proper completion of the drainage layer, IDOT chose a volume calculation method that was not consistent with the contract and does not accurately account for the total volume of material actually placed by Claimant. IDOT's improper calculation method has resulted in Claimant not being paid for $24,420 that is due.

## Count VI:  Extra Depth Width and Deductions for Mainline Concrete Pavements

The specifications for the project require that the depth of the concrete pavement be 11½ inches. Claimant knew exactly how to set and adjust its paving equipment in order to achieve the required 11½-inch depth. IDOT interfered with Claimant's methods and adjustments. By unilaterally instructing Claimant to raise the settings for its pavers, IDOT required a final thickness of 12 inches, a full half-inch more than required. When accounting for the extra half-inch throughout the entirety of the project, the result is that Claimant incurred $117,865.15 in unnecessary costs for which it has not been compensated.

IDOT also refused to pay Claimant for the costs related to two inches of extra width of the mainline pavement. Despite the benefit to IDOT and the general public as a result of the additional two-inch width, IDOT refused payment. The result was an $8,555 direct cost to Claimant that has not yet been paid.

IDOT also engaged in unnecessary, hypercritical inspection practices of Claimant's finished product. IDOT assessed Claimant $970.56 in inappropriate charges.

## Count VII:  Improper Rejection of Pavement Under Nettle School Road

At the completion of the paving under the bridge for Nettle School Road, IDOT required Claimant to remove hundreds of feet of concrete that it had just laid. During the process of removing the concrete, it was determined that the removal was indeed unnecessary. The result was a substantial cost to Claimant of $19,127 that has not yet been paid.

### Claimant's Entitlement to Pre-Judgment Interest

Claimant formally filed its claim for additional compensation on November 1, 1994. Claimant's claim was supported by extensive documentary evidence. IDOT rejected Claimant's claim, which ultimately resulted in the lawsuit now before the Court. Claimant is entitled to pre-judgment interest at the rate of two percent per month from December 1, 1994, through the date of final payment. State Prompt Payment Act, 30 ILCS 540.

## RESPONDENT'S ARGUMENT

Respondent argues that Claimant is only entitled to damages totaling $208,730.23. The contractor has quantified its damage claim in a way that seeks compensation for amounts not allowed by the terms of the contract. In particular, the contractor seeks extended field office overhead using figures not based on direct costs. Moreover, the contract does not allow home office overhead calculations based on a prorata method such as that used by the contractor. The contract requires direct, documented cost as the basis for any payment.

### Count I (Unpaid Direct Costs for Traffic Control)

The Court should deny the amount claimed for count I because there is no basis for payment.

F.A.I. Route 80 was to be kept open to traffic during construction by means of temporary cross-overs to redirect traffic from a four-lane divided highway to a two-way lane configuration. The contract as bid contained various traffic control and protection standards. The two-way, two-lane traffic was planned to be separated by the existing raised pavement markers (RPMs) and contractor-installed temporary double yellow four-inch lines. The one-way visible crystal lenses in the existing RPMs were to be removed and replaced with two-way visible amber lenses.

On March 26, 1993, after commencement of construction, but before completion of the temporary crossovers, IDOT's construction engineer, Dan Mestelle, advised Claimant's project manager of a decision made by IDOT to augment the planned traffic control features. IDOT resident engineer Wayne Phillips gave Claimant written notification of the traffic control change. The notifications provided a plan revision, instructed Claimant to proceed immediately with material acquisition, and provided approximate quantities for each stage of the project. The field notification was followed by a letter dated April 1, 1993, providing the traffic control additions and seeking a lump sum price proposal from Claimant for the changes.

Respondent made the traffic control changes in accordance with the terms of article 104.03 of the standard specifications. The changes would be paid for as an addition to the contract pursuant to article 109.04 of the standard specifications. The revised plan added a concrete barrier wall, crash cushions, extended concrete pavement tapers, and alternating flexible delineators.

Pursuant to article 109.04 of the standard specifications, Claimant was compensated for the additional work involved on a force account basis rather than on the basis of an agreed lump sum price. The details of the force account payment process are established in article 109.04 of the standard specifications and applies when unit prices bid do not apply and the contractor and IDOT are not able to agree to a lump sum price or unit prices for the extra work.

Claimant has been fully and fairly compensated for all work and direct costs associated with the placement of the original and expanded traffic control features.

## Count II (Unpaid Direct Costs–Additional Lime Modification of Soils)

In count II, Claimant seeks an additional $40,333.01 in direct costs, $1,774.65 in profit, and $120.01 in bond costs associated with the processing of lime modified soils. The contract plans set out the typical sections of the new roadway to be constructed. The plans contemplated that the modification of the soil would be accomplished by the construction of a lime modified soil layer composed of soil, lime and water to the lines, grades and cross sections shown on the plans. The work was governed by article 658 of the standard specifications.

The plan sheets indicating the typical sections called for lime modified soil to a depth of 12 inches. Given that requirement, the plan sheets also indicated the estimated quantities of material and work needed to construct this feature of the work throughout the length of the project. The estimated quantity for processing lime modified soils 12 inches was 306,572 square yards. Article 102.04 of the standard specifications provides for the payment of the contract at the actual quantity of work done:

"102.04 Interpretation of Quantities in the Bid Schedule. The quantities appearing in the bid schedule are approximate and are prepared for the comparison of bids. Payment to the Contractor will be made only for the actual quantities of work performed and accepted or materials furnished in accordance with the contract. The scheduled quantities of work to be done and materials to be furnished may each be increased, decreased or omitted as hereinafter provided."

The actual final quantity of this pay item was measured at 337,219.29 square yards or an increase over the estimated quantity of 10%. Claimant was paid in full for the actual measured quantity.

During the lime modification process, soft subgrade areas at several locations were found. Respondent made the decision to lime modify these areas to 16 inches instead of the planned 12 inches in order to achieve the desired

stable road base. The parties agreed to a unit price of $1.40 per square yard to process the 16-inch areas. In total, 81,607 square yards were processed to the 16-inch depth which were paid at the agreed unit price of $1.40 for a total of $114,249.80. Claimant continued to accept the agreed unit price of $1.40 for the 16-inch depth areas, without objection, for the duration of the project as areas were discovered, modified, measured and paid. The work involved with processing 12 inches and 16 inches is basically the same. Claimant was paid a total of $369,862.23 for all lime modifications at actual measured quantities for the 12- and 16-inch depth areas.

Claimant also seeks additional payment for what were described as additional trimming costs and excess material hauling costs due to extra "fluff" generated by the lime modification process. The term "fluff" is used by Claimant to denote the amount of modified soil material created by the lime modification process in excess of that which was retained in the modified layer to achieve the required depth and grade. Under the terms of the contract, the removal of excess material to achieve the planned line and grade was paid as earth excavation (special). Claimant argues that since more lime was used than the bid estimate quantity, and that since more passes than it anticipated were made during trimming or blading operations, some adverse soil condition must have existed in all lime modified areas to generate extra "fluff." Claimant also argues that the 16-inch areas must have generated extra "fluff."

Claimant's argument is not well taken. The contract did indicate an estimated quantity of 6,131 tons of lime for bidding purposes. The contract plans also provided the application rate of 40 lbs. per square yard applied to the 12-inch depth lime modification areas. As a result of

the addition of 16-inch depth areas, the application rate for the 16-inch areas indicates a 55.2 lbs. per square yard rate. The resultant calculations indicate, on the basis of the total tonnage paid per the square yards, a 2.6% overrun of the planned application rate. In addition, the actual square yards processed indicates a 10% overrun of planned quantities.

The indicated overruns are attributable to the areas re-limed to expedite the work rather than poor soil conditions throughout the project (other than the 16-inch areas). Wet weather occurred during the modification work. IDOT paid Claimant to reprocess several locations to expedite the work rather than waiting for drying days. IDOT also agreed to lime the contractor's haul road during stage II work to expedite the work. When the tonnage for these areas is subtracted from the actual tonnage paid, the result is 6,731.45 tons. This amount is virtually the same as the planned quantity. The remaining balance would be attributable to the 16-inch areas. Therefore, the amount of lime used does not disclose some unknown poor soil condition throughout the project, which caused extra lime use and, as a result, extra trimming costs.

Respondent is not responsible for Claimant's assumptions regarding the number of trimming passes required over the 12-inch modified areas. Respondent did not advertise the amount of "fluff" to be expected and did not warrant anything to Claimant in this regard.

It was Claimant's responsibility to determine the desired elevation of the modified soil prior to trimming operations. The contract was written to provide 12 inches of lime modified soil to the lines and grades advertised. Respondent and knowledgeable contractors bid a price to accomplish the work taking into account the variable risks. Claimant cut the grade 0.1 feet lower than the theoretical to account for the "fluff" effect. This technique

only produces an approximation of the final grade desired. Claimant should be held responsible for knowing that such a method or technique is not capable of producing anything other than an approximation of the final grade desired. Variations in elevations should be expected. The fluff amount is not predictable. The matter is one included in the basic, normal risks undertaken by contractors doing such work.

Respondent does recognize the fact that some additional volume of material was generated in the 16-inch modified areas. A calculation was done, based upon the earth excavation (special) pay item, to compensate Claimant for the actual volume over the amount anticipated for an unaltered area. Claimant was previously compensated for all measured earth excavation (special). What remains is the calculated extra volume to be removed at the earth excavation (special) price.

Respondent recommends an award of not more than $6,900 for count II.

Count III (Unpaid Direct Costs–Earth Excavation)

The contractor seeks an additional $461,690.92 in direct costs, $14,381.46 in profit, and $1,356.81 in bond costs related to its claim that additional quantities of earth excavation (special) were performed and that the condition of the existing sub-base caused additional hauling and waste disposal costs. Claimant underestimated the quantity of dirt to be excavated and no award should be made for this Count.

The contract contained the following special provision to establish a pay item to govern the measurement and payment of the work associated with handling excess materials during stage I and stage II:

"EARTH EXCAVATION (SPECIAL): This work shall include all excavation, embankment, grading, and disposal of excess materials required to construct the proposed roadway to the lines, grades, and cross sections as shown in the plans. The work under this item shall be in accordance with applicable portions of section 202 and 207 of the Standard Specifications, as shown in the plans, and modified herein.

Excess materials shall not be disposed of within the right of way. Aggregates recovered from the excavation process may be used for the proposed aggregate shoulders as provided elsewhere in these special provisions.

Embankment material should not be placed and compacted at moisture contents in excess of 110 percent of optimum moisture unless authorized in writing by the Engineer.

Method of Measurement. Earth Excavation (Special) shall be measured in units of 100 lineal feet of two lane roadway, measured along the center of each lane.

Basis of Payment. This work shall be paid for at the contract unit price per unit for EARTH EXCAVATION (SPECIAL). This cost includes providing soil capable of sustaining vegetation in disturbed areas. No additional compensation will be paid for overhaul.

Pavement removal and under drain removal will be paid for as explained elsewhere in these special provisions."

The contract plans included cross-sections to show the work required in the median. The cross-sections indicate virtually no outside slope work. These cross-sections are found at sheets 57-83, mainline cross sections, on the plans.

After Claimant raised the issue of additional earth excavation quantities, Respondent cross-sectioned the existing westbound lanes prior to removal. These cross-sections, when plotted against those in the plans, proved to be reasonably accurate. Some variances outside the shoulder breaks were noted, but this was outside the limits of required work.

Respondent agreed to allow Claimant to raise the profile grade up to 2V for stage II at its discretion provided the required clearances at the overhead structures were maintained as shown in the plans. This approval was made as a convenience and not as a result of "poor soils" or "inaccurate cross-sections" as alleged in the claim.

The plan details and specifications indicate that the existing pavement structure included a six-inch sub-base. Since this pavement structure was in place for over 30 years, the condition of the sub-base was not known or indicated in the plans.

Claimant oversimplified its calculations. It is based on the details found on sheet no. 10 of the plans. Those computations do not reflect the changes to the profile grade line or super-elevation corrections that were required. Departmental report exhibit 18 was prepared utilizing these profile grades. With this information, it is apparent that Claimant could have expected to remove 85,844 cubic yds. of material. This compares with Claimant's rough quantity (load counts) and added "fluff" created by lime modified soils. Additionally, the lime modification to a 12-inch depth should have generated an additional 12,263 cubic yds. of material. Therefore, Claimant should have anticipated a total of 98,107 cubic yds. of material to excavate.

Furthermore, Claimant's field operations added complication to the work required. During earth excavation removal, large quantities of dirt were bladed over and onto the existing slopes. The plans showed minimal work to be done to these sideslopes, but the contractor's operations greatly changed things. This sideslope dirt now had to be removed and was accomplished by the use of large excavating backhoes and trucks. The existing slope condition was lost during this remedial work, and as a result, Claimant shaped the areas affected to a basic 4:1 slope. These circumstances were recorded on July 21, 1993, by the Department's resident engineer in his diary and were brought to the attention of Claimant. This material was hauled off the job site utilizing the newly-constructed slab and not the dirt shoulders.

Respondent did recognize that some salvage value may potentially exist and allowed Claimant to reuse this material for the proposed aggregate shoulders. Respondent did not guarantee the condition of the existing granular materials.

Respondent did not provide Claimant with designated haul roads, as that was Claimant's responsibility. From the beginning of the project, Claimant planned on using the existing local road network.

Accordingly, the claims in count III should be denied.

### Count IV (Additional Cement in Cement Layer)

Claimant seeks an additional $11,704.20 in direct costs, $514.98 in profit, and $34.82 in bond costs for the cost of cement used in the cement treated open-graded drainage layer (hereinafter referred to as "O.G.D.L."). The O.G.D.L. was a feature of the construction intended to provide better drainage under the paved surfaces. The contract contained a special provision for the O.G.D.L. work, which in relevant part provides:

"OPEN-GRADED DRAINAGE LAYER:

Description: This work shall consist of constructing a cement treated open-graded drainage layer on a prepared surface to the liens, grades, thickness, and cross-sections as shown on the plans.

Materials: Materials shall also meet the requirements of the following articles of Section 700 of the Standard Specifications:

| ITEM | ARTICLE/SECTION |
|------|-----------------|
| a) Portland Cement | 701 1/ |
| b) Water | 702 2/ |
| c) Coarse Aggregate | 704.01 3/ |

Note 1/ Portland Cement shall be Type I or Type II. Cement content shall be no less than 200 lbs./cu. yd. and no more than 280 lbs./cu. yd. Replacement of the cement with a pozzolan will not be permitted.

Note 2/ The water-cement ratio shall be approximately 0.50, and will be adjusted as required by the engineer to insure aggregate bonding when the mixture is placed and compacted."

Claimant initially submitted a mix design pursuant to the special provision for the O.G.D.L., which used a cement content of 200 lbs./cu. yd. Respondent directed the use of a mix design using a cement content of 240 lbs.

Claimant was allowed to produce O.G.L.D. material at a cement content of 217 lbs./cu. yd. for a period of time. After a review of Claimant's production at this cement content, Respondent approved the mix change for the remainder of the project.

Claimant claims that it intended to produce the O.G.D.L. material at a cement content of 200 lbs./cu. yd. and reflected this in its bid price. IDOT agrees that an award for additional cement quantities used to produce the materials for the O.G.D.L. is appropriate.

Claimant has sought $11,704.20 in actual direct costs. That figure does not correspond to Respondent's calculations, which are based upon a total of 481,007.5 lbs. of cement used in excess of what would have been used at the 200 lbs./cu. yd. amount. At Claimant's indicated costs of cement per ton at $60.00, Respondent calculates the direct cost at $14,430.23 (481,007.5 lbs. B 2,000 lbs./ton x $60/ton = $14,430.23).

IDOT recommends that an award of $14,430.23 be made for direct costs only for this count of the complaint. No award of profit or bond costs are allowable under the terms of the special provision for contract claims, basis of payment and none should be awarded.

Count V (Additional Quantity of Drainage Layer Material)

In count V, Claimant seeks an additional $24,420 for unmeasured and unpaid quantities of the O.G.D.L.

The typical sections, which were provided with the plans for the contract, indicate the lines, grades, thickness

and cross-sections for the construction of the O.G.D.L. Claimant contends that these typical sections show the top of the 4V thick O.G.D.L. extending to an outside width 6V past the concrete shoulders on the top of the layer, and sloping down and outward to an outside width of 12V (13 on the typical sections) past the concrete shoulders at the bottom of the layer. Claimant argues that the method of measurement was in cubic yards. The relevant portion of the special provision states:

"b) Measured Quantities. Open-graded drainage layer will be measured in-lace and the area computed in square yards. The width for measurement will be the dimensions as shown on the plans."

Claimant calculates the area of the slope at the end of the O.G.D.L. for the length of the project to arrive at the claimed amount.

The pay item was not cubic yards but square yards. Respondent measured and paid the subject quantity based upon a width measurement from the outside to outside edges along the top of the layer. The typical sections provided detailed dimensions for the top of the O.G.D.L. and for the top of the lime modified soils. The special provision also incorporates article 218 of the standard specifications. Article 218.39 provides that the width for measurement will be from the outside to outside along the top of the final layer of the completed work as shown on the plans. The square yard method of measurement was verified by form BC981 which was signed by the parties.

The common practice in the construction industry for the method of measurement of such work is in square yards. Claimant knew at the time of bidding that:

1. the mainline quantities given on sheet 8 of the plans disclosed O.G.D.L. quantities of 299,282 square yards;

2. the mainline quantities chart further indicated in station to station detail the linear feet where the O.G.D.L. would be placed for a total of 65,693.91 linear feet; and

3. the typical sections disclose a O.G.D.L. top outside to outside surface width of 41 feet.

The verification of the pay item quantity can be done by a simple calculation converting the square yards to square feet and dividing the result by the linear feet total to find the width upon which the quantity was figured. The calculations would disclose the following result:

$$\frac{(299,282 \text{ Sq. Yd. x 9})}{65,694 \text{ lf}} = 4 \text{ lf}$$

The pay item in question, as provided in the special provision, was to be measured "in place and the area computed in square yards." The computation was not to be done in cubic yards or any other measure of volume. There is no reasonable basis for an experienced contractor to determine that the measurement for payment would be computed on the measurement of a volume in the face of the express area measurement provided.

### Count VI (Extra Depth Width and Deductions for Mainline Concrete Pavements)

Claimant seeks an additional $122,076.24 in direct costs, $4,952.23 in profit, and bond costs of $362.03 for additional depth and width of concrete pavement placed, and for thin pavement deductions.

### Depth of Pavement

The contract plans required Claimant to construct pavement to a thickness of 11½V. The probe readings were within construction tolerances. Pavement thickness

was found to be in excess of the required 11½V. Claimant was able to make adjustments to the paving machine when the thickness was found to be in excess of the required 11½. At no time did Respondent take over and direct the paving operations or substantially interfere with the contractor's paving activities.

The real cause of the thickness variation is found in Claimant's method of construction. Claimant chose to run its slipform paver off a stringline rater than ski off the O.G.D.L. This method lends itself to some thickness variations.

This issue was never raised by Claimant as a significant problem during the paving operations. Claimant was fully aware of the variances which occur when paving on such sub-bases, and this would have been taken into account in its bid price. Accordingly, this Court should not grant an award on the depth of pavement claims stated in this count.

Width of Pavement

The project plans clearly detail the widths of the proposed pavement and adjacent shoulders which Respondent expected Claimant to place. Prior to stage II shoulder work, at Claimant's request, Respondent allowed Claimant to pave the shoulders 1 narrower than shown in the plans due to the resulting wider pavement that was constructed.

It is the responsibility of Claimant to provide the equipment to meet the plan requirements and to make equipment adjustments to provide the required product in an economical manner.

In its administrative claim submission, Claimant conceded that it had no right under the contract to payment for wider pavement. No award should be made.

Thin Pavement Deductions

Respondent performed the inspections for this project as provided in the specifications.

The minor contract penalties assessed are justified by the terms of the contract. Accordingly, the Court should not grant any award for this aspect of count VI.

## Count VII (Rejection of Pavement Under Nettle School)

The contractor seeks an additional $18,268.81 in direct costs, $803.03 in profit, and $54.36 in bond costs related to the directive to remove and replace defective work under the Nettle School Road. Reimbursement is sought for 100 feet of the 167 feet of pavement ordered replaced.

On June 15, 1993, Claimant placed CRPCC pavement from Station 915 + 10 to 926 + 90. Included in the paving of this area was the task of paving under the Nettle School Road Overhead located at Station 925 + 88.

This was the first location to pave under an overhead. The location of piers would not allow the passage of trucks and paving equipment simultaneously. Claimant's plan was to back trucks, one at a time, down the haul road from locations further up station from Nettle School Road. This procedure adversely affected concrete placement and finishing operations and could lead to delamination.

On June 15, 1993, at 2:00 p.m., the finishing machine was at station 925 + 00 at 2 p.m. The ending header was at station 926 + 80 at 5 p.m. Therefore, the finishing machine advanced only 180 feet in three hours. The finish machine had stopped many times for long time spans, sometimes up to an hour. The resulting quality of finished pavement was seriously compromised. The resident engineer discussed the situation with the contractor's paving

superintendent and verbally notified him that 167 feet of pavement (station 925 + 13 to 926 + 80) was unacceptable and that it must be removed.

Claimant did not act on this directive until the order was reiterated the next morning at the scheduled progress meeting. Claimant did admit at this meeting that some of the previous day's pavement was questionable.

Respondent's directive to remove and replace this 167 feet of pavement was based on articles 408.11, 408.12 and 408.20 of the standard specifications and observed field conditions. Article 408.11 requires bottom lift concrete to be "topped-off" within 20 minutes of placement. Article 408.12 directs the installation of a transverse construction joint when there is an interruption of more than 30 minutes in the concreting operations. Article 408.20 states that the operations of depositing, spreading, consolidating and finishing shall be such that, insofar as possible, continuous operations of the paver will be maintained and frequent starting and stopping of the paver should be kept to a minimum.

Respondent was, without question, within its contractual rights to order removal and replacement to assure that a quality pavement was constructed.

### Count VIII (Direct Costs Resulting from Abnormal Weather)

Claimant claims that it encountered abnormal and severe weather conditions during the performance of the contract. Claimant seeks direct costs due to lost productivity during the construction of the O.G.D.L. and during its concrete paving operations in the amount of $217,071.81. Additional direct costs associated with extra haul road maintenance costs are sought in the amount of $42,325.18. Bond costs on the above amounts are sought in the amount of $739.28.

Claimant bid the contract and agreed to undertake the work entailed, beginning on March 1, 1993, and to complete the work by October 30, 1993. Claimant should not be excused from its obligation of timely performance or become entitled to additional compensation because it encountered unforeseen difficulties caused by northern Illinois weather. Furthermore, it is the contractor's responsibility to make up for any delays or lack of progress due to bad weather during periods of good weather. The Claimant never demonstrated a reason for relief, either in time or money, on account of weather conditions.

Any time or money relief due to Claimant would be governed by the express terms of the contract. The only express provision found in the contract concerning additional time for weather related delays is found in article 108.09 of the standard specifications.

This provision of the specifications allows time relief due to weather events which are singular occurrences in duration and intensity. Nothing in the contract removes or changes the risk from Claimant for a wetter than normal period during the construction season. Abnormal weather was never a justification for extension of the incentive date of this contract. The provision only grants time relief, not money, for a duration determined by Respondent to be equitable.

The daily weather conditions recorded in Respondent's resident engineer's daily diary and weather information from the Midwest Climate Center in Champaign, Illinois, indicates that the month of June was wetter than what could be expected in a normal year. It also indicates closer to normal precipitation in all other months of construction. When this information is combined with the fact that Claimant has not made out any circumstances rising to the level of an Act of God as defined in the contract, it is clear that the weather impacted days are less

than the Claimant has attempted to make out. The diary discloses not more than 40 days genuinely impacted. Respondent expressed disappointment to Claimant regarding the inefficient use of good weather days.

The daily diary is replete with instances of contractor mismanagement sufficient to cause its own problems. The resident engineer recorded the problems the stage I crews were having and Claimant's lack of attention to details of the work, such as neglecting to cut weeps. The failure of Claimant to adequately maintain the haul roads for proper drainage is well documented.

As far as a written request for an extension of time is concerned, none were made by Claimant during the most severe periods of the claimed weather impacts which now form the basis of this count of the claim. Several times the contractor indicates that it believed it had justification for an extension to the completion date, but it did not present a written request until October 22, 1993, only five days prior to completion of all work subject to the incentive.

## Count IX (Additional Incentive Payments)

Claimant, in count IX, seeks acceleration and delay costs arising out of the alleged time impacts caused by the issues addressed in counts I, II, III, and VIII, in addition to one other issue concerning the protection of temporary light poles. The basic claim of Claimant is that extra work and severe weather combined to delay progress in completing the work of the contract and Respondent should have granted time extensions for specific causes. The failure to grant extensions caused the expenditure of additional funds to complete the work before the completion date. Claimant also hopes to earn additional incentive payments, home office overhead, field office overhead, direct costs for night lighting, and minor profit and

bond amounts. The total sought adds up to $901,224.88 for this acceleration and delay count.

The recovery of any amounts under this count is dependent on Claimant's success in demonstrating that the actual causal events presented in the relevant counts of the complaint (counts I, II, III and VIII) entitle the Claimant to a time extension which was not granted. For those causal events which were related to extra work (counts I, II and III), the Claimant must prove IDOT's responsibility. Claimant must demonstrate that the resulting delay was Respondent's responsibility, that the delay was to a controlling aspect of the work, and that the delay was not running concurrently with some delay caused by Claimant, or during a period of no real impact to the time of performance.

At trial, Claimant provided a time analysis which relied upon the production of an "as built" schedule and an "adjusted as built" schedule for the contract stages and the contract duration in its entirety. The "as built" schedule was presented as an accurate history of the project with compensable and noncompensable delays accounted for and included. The "adjusted as built" schedule was presented as reflective of how the project would have progressed had Respondent not caused each delay involved and had the weather not impacted the project. The "adjusted as built" schedule was created by Claimant's opinion witness, Richard Ott. It collapsed the "as built" schedule by removing the delay durations for which Claimant believes it was entitled to extensions of time.

Respondent presented the testimony of Stan Grabski whose current position is project review engineer for IDOT as an opinion witness. Mr. Grabski reviewed Claimant's progress schedule. It indicates how Claimant planned to complete all work and indicated the controlling items of work for the schedule.

The original schedule indicates that the contractor intended to begin March 1st, intended to switch traffic for stage I work on March 24th, intended to switch traffic to start stage II on June 24th, and intended to complete the work not subject to the 20 working day clean-up by October 1st. Claimant planned on stage I and stage II taking a total combined 190 calendar days to complete after a 24-calendar day period which Claimant has called pre-stage I.

The actual time of performance from IDOT records and as submitted by the Claimant indicate that Claimant began on March 1st, switched to stage I traffic on April 19th, switched to stage II traffic on August 14th, and completed the work not subject to the 20 working day clean-up period on October 26th. Claimant used a total 190 calendar days to complete stage I and stage II.

It is apparent that the only difference between the performance duration as originally planned and as actually carried out was the extra 26 calendar days used during the pre-stage I activity. Aside from performing stage I and stage II later in time and taking longer to perform stage I, as compared to stage II, Claimant performed in the same time as planned. Thus, the Court's focus for consideration of time impacts should be on the reason the pre-stage I work took 26 extra days.

The only factors relevant to the time of performance required for the pre-stage I work, other than those under Claimant's control, were the weather and the expanded traffic control work added by IDOT.

Expanded Traffic Control

Respondent decided to expand the traffic control protection. Claimant was notified of this change in the traffic control requirements on March 26, 1993. Claimant

was instructed to begin acquiring materials immediately and to provide IDOT with agreed prices to cover the various items. Respondent's formal letter was provided on April 1, 1993.

The series of events that took place from notification of the traffic control additions to installation prior to stage I head-to-head traffic indicates some miscommunications between Claimant and its subcontractor, Midwest Construction Services ("MCS"). Claimant's contemporaneous records place a great deal of blame on MCS. Once the materials did arrive on the job site, the installation was completed within two days.

To demonstrate that the traffic control additions had no impact on the date of switching traffic, IDOT prepared a time line to detail the sequence of events involved with the construction of the temporary crossovers. This time line shows that the traffic switch date could not have occurred any sooner than April 19, 1993. It also shows that the sub-contractor constructing the cross-overs never left the job site, thus remobilizing was not necessary.

Claimant indicated at the pre-construction meeting that they hoped to make the first traffic switch by March 24, 1993. However, prior to any changes, Claimant was already behind schedule. Claimant did not have even 50% of one cross-over completed before being requested to make traffic control additions. The cross-overs were not completed until April 12, 1993, approximately three weeks from the March 24th switch date.

Claimant attempts to explain away the need to make any effort to make up time in the construction of the cross-overs because of a delay in arrival of the additional items. Acquiring the materials for the traffic control

changes had no influence on the physical construction of the cross-overs.

Claimant was significantly behind on the controlling item or work, temporary cross-over construction. The non-controlling traffic control work, as changed by Respondent, could not account for the 14-day time loss claimed to be suffered by Claimant and certainly not the entire 26 days of actual late performance deviating from its own planned schedule.

Weather

Claimant argues that adverse weather conditions impacted the date on which it was able to switch to stage I work after the pre-stage I work was completed. Weather did not impact the project. In addition to the precipitation information presented in exhibit 26 of the departmental report, the daily diary of the resident engineer indicates the level of work activity for each day prior to the stage I switch. Claimant claims 29 days in which it was impacted by abnormal weather. Claimant did considerable work on 23 days of the month, 17 of which occurred before the planned switch date. Claimant did no work on the four workable Sundays of the month. Claimant had 27 days on which it worked or could have worked in March. The meteorological data indicate that March and June were wet months, but it also indicates that there were months during the construction project that were dryer than average.

Respondent recognized when it designed this project for letting and construction early in the construction season that adverse weather would be likely during March. In order to obtain the rapid cross-over construction necessary to advance the main stage I work, Respondent designed the cross-overs using an aggregate stone

embankment with concrete pavement construction rather than using a more common dirt embankment with bituminous pavement. This method was intended to provide the ability to work in wet conditions.

The circumstances existing during March and early April, 1993, did not rise to the level necessary for time relief under the express terms of the contract. The 26-day actual delay was simply not adequately explained.

Respondent's Conclusions

Claimant had not efficiently performed during the pre-stage I and stage I work. The entire 26-day period was not caused by Respondent's actions. Through the time-impact analysis performed by Mr. Grabski, it was determined that at most, a five-day impact was possible on account of the added work. Given that the Claimant never made up the 26-day extended performance on the pre-stage I work, the five-day impact meant that the Claimant could not have finished work that many days earlier in October. That would have resulted in additional incentive day payments of $75,000.

Claimant performed in an accelerated manner after the denial of the verbal request for an extension of time made at a progress meeting on September 14, 1993. Respondent calculates the accelerated efforts over and above that originally planned to be $112,400. Any additional amounts claimed by Claimant are not warranted. This is especially true for the extended overhead costs.

Therefore, based upon the foregoing, Respondent recommends that any award based upon this count of the complaint be limited to $187,400.

Claimant's Claim for Prejudgment Interest

Claimant also seeks prejudgment interest from December 1, 1994, through the date of final payment. It is

well-settled that this Court is without jurisdiction to grant prejudgment interest (*Dimmitt & Owens Financial, Inc. v. State* (1992), 44 Ill. Ct. Cl. 25). Accordingly, the Court must deny this portion of the claim.

## DISCUSSION

The general rule is that a contractor is bound by the damage provisions of the contract and has no right to additional compensation for delays which prevent the contractor from completing the contract unless the delays are the sole responsibility of the State. *Illinois Contractor Corporation v. State* (1993), 45 Ill. Ct. Cl. 124, citing *Johnson County Asphalt v. State* (1987), 39 Ill. Ct. Cl. 36 and *Walsh Construction Co. v. State* (1964), 24 Ill. Ct. Cl. 441.

It is inevitable there will be some delays and delay will be tolerated if reasonable. (*J.F., Inc. v. State* (1988), 47 Ill. Ct. Cl. 5.) It is Claimant's burden to prove the contract, the breach, and the damages. (*Davinroy v. State* (1991), 44 Ill. Ct. Cl. 268.) The Court in *Fruin Colmon Contracting Co. v. State* (1967), (26 Ill. Ct. Cl. 138) stated that, "[w]here the evidence shows more probably than not that the respondent should have granted reasonable extensions of time for delays due to unforeseen causes beyond claimant's control and without claimant's fault or negligence, then claimant is entitled to all retainage without liquidated damages." (26 Ill. Ct. Cl. 138.) The State should allow an extension where the cause is not the fault of the claimant. *McHugh Construction Co. v. State* (1971), 27 Ill. Ct. Cl. 232.

One of the primary methods used by Claimant to present its case was to provide testimony and demonstrative evidence through its opinion witness, Richard Ott. Mr. Ott prepared an "as-built" schedule. The purpose of the "as-built" schedule was to analyze through graphical portrayal the relationships between activities, similar to

the critical path method ("CPM") scheduling. The objective was to determine how the work would have been constructed absent delays, extra work or changed conditions. Mr. Ott reached the conclusion that a total of 35 days were lost due to significant extra work. He also concluded that there were 29 days in which Claimant was impacted by weather.

In count I, Claimant seeks $6,549.87 allegedly for unpaid direct costs of expanded traffic control. There does not appear to be a dispute that significant extra work was performed. Respondent only asserts that Claimant was fully and fairly compensated for the additional work involved on a force account basis. Although Claimant did not explain the basis of the claimed amount, other than specifying that $6,245 was for extended lane closures, and $275.26 for profit (at 4.4%), Claimant did request in its request for equitable adjustment that it be compensated at the rate of $782 per calendar day for eight days of lane closures for a total of $6,256 due to the expanded traffic control work. Mr. Ott testified that the expanded traffic control and the extra additional work in pre-stage I caused 14 days of delay to Claimant. Of the 14 days, nine days delay and impact were occasioned by expanded traffic control for the procurement of material and five days due to the expanded control work which caused extra work.

Respondent did significantly alter the traffic control requirements at a very late date. Although Respondent knew that it was going to change the traffic control requirements, it did not notify Claimant early enough to allow Claimant to factor the changes into its planning and preliminary work. Claimant should be awarded $6,549.87 pursuant to count I.

In count II, Claimant seeks $42,227.67 for its unreimbursed direct costs caused by the additional lime requirements. Claimant claims it was not paid for adding

lime to an additional four inches of depth (from 12 inches to 16 inches) to increased locations. Respondent's evidence and arguments thoroughly contradicted Claimant's claim for additional expenses with one exception. Respondent agrees that $6,900 be awarded to Claimant pursuant to count II for extra earth excavation. Claimant should be awarded $6,900 pursuant to count II. As to the remainder of count II, we find that Claimant failed to prove its claim by a preponderance of the evidence.

In count III, Claimant asserts that IDOT's elevation data was flawed and Claimant had to excavate and remove a greater amount of soil than that set forth in the contract. The significant extra work resulted in direct costs of $477,729.09. Neither the evidence presented at the hearing, nor the information contained in Claimant's request for equitable adjustment prove Claimant's claim by a preponderance of the evidence. The relief sought in count III should be denied. We find Respondent's arguments persuasive.

In count IV, Claimant seeks $12,254 in additional costs regarding the open-graded drainage layer. The specifications required no less than 200 lbs./cy. and no more than 280 lbs./cy. Claimant submitted a mix design at 200 lbs./cy. but Respondent directed Claimant to use 240 lbs./cy. Respondent's calculations show that Claimant is owed $14,430.23 for additional cement costs. Claimant should be awarded $14,430.23 pursuant to count IV.

In count V, Claimant seeks $24,200 for additional drainage layer. Neither the evidence at hearing, or the information obtained in Claimant's request for equitable adjustment prove that Claimant is entitled to any additional compensation by a preponderance of the evidence. The relief sought in count V should be denied.

In count VI, Claimant contends that IDOT inspectors interfered with Claimant's methods of using its paving equipment. The contract specified that concrete be at an 11½ inch depth. Claimant presented evidence that IDOT personnel would not allow Claimant's paving crew to operate the paving equipment in the manner which would produce pavement at the required level. Respondent did not present any evidence refuting the alleged interference by its personnel, instead it only argues in its brief that paving was under the control of Claimant. Claimant also asserts that the average thickness for the concrete in stage I was 12.2 inches and in stage II was 12.4 inches. Respondent does not dispute the calculations of the damages requested by Claimant assuming half-inch additional thickness. Claimant should be awarded $117,865.15 for the costs associated with the interference causing the additional thickness of concrete in count VI. However, Claimant has not met its burden to prove that: (i) Respondent should pay $8,555 for an additional two-inch extra width of the mainline pavement; and (ii) Respondent improperly deducted $970.66 in inappropriate charges due to alleged hypercritical inspection practices.

In relation to count VII, Claimant contends that IDOT directed it to remove 167 feet of mainline pavement. Claimant alleges that the removal of the concrete under Nettle School Road was unnecessary and it incurred $19,127 in costs. A coordination problem had apparently existed between the laying of a bottom layer of concrete for the affected area and the top layer of concrete. The concrete was not placed in accordance with the requirements of the contract. The next day IDOT ordered all 167 feet of pavement be removed. It appears that 100 feet of the 167 feet removed did not exhibit any problems and this is the amount for which recovery is

sought. Claimant's contention is that IDOT should have ordered removal prior to allowing the concrete to cure.

The paving operation was not performed in conformity with the contract and Respondent was within its contractual rights to order removal and replacement of the 167 feet of pavement. The relief sought in count VII should be denied.

As to count VIII, Claimant seeks $260,136.27 for additional labor, material costs, and costs related to additional maintenance of the dirt haul roads caused by abnormal and unusual weather conditions. Claimant alleges that rainfall was heavier than historical norms. Recovery is sought pursuant to the "Act of God" provision contained in article 108.09(b). This provision, as Respondent argues, allows for an extension of the completion date and does not contemplate reimbursement for direct costs experienced by the contractor. Although the usual application of the type of phenomena of nature is the type of event that is singular in occurrence, i.e., earthquake, tornado, flood, cloudburst, the definition section also includes an express exception stating that a "rain, windstorm or other natural phenomenon of normal intensity * * * shall not be construed as an 'Act of God'." Respondent argues that the length of time for which the work was to be performed (March 1st through October 30th) allowed Claimant sufficient time to make up for delays caused by weather. Respondent agrees that the month of June was wetter than could be expected in a normal year. Additionally, review of exhibit 14 of Claimant's request for equitable adjustment does indicate that 14 days were rained out in June. These two sources graphically illustrate the significant differences in rainfall between June, 1993, and the prior 30 years at the Marseilles Lock Station, the site closest to the construction. The Court finds

that Respondent should have extended the completion date. The contract requires that the number of days to be extended is to be determined by IDOT on an equitable basis. In its request for equitable adjustment, Claimant argued that it was denied at least eight work days performance in June which created an 11-calendar day delay. The completion date of the contract should have been extended by eight days, thereby affecting the incentive date in favor of Claimant by eight days. An additional eight incentive days would constitute an award to Claimant of $120,000.

In count IX, Claimant seeks $901,224.88 acceleration and delay costs arising out of the alleged time impacts caused by the issues addressed in counts I, II, III, and VIII. Respondent acknowledges that a five-day impact was possible because of added work which would have resulted in additional incentive payments of $75,000. Respondent also agrees that Claimant is entitled to $112,400 for costs associated with accelerated efforts over and above that originally planned. The Court agrees with Respondent and finds that Claimant has not proven that it is entitled to any additional costs for acceleration efforts or award for any additional incentive payments beyond the $187,400 agreed to by Respondent.

The Court's decisions herein as to each issue are based on our findings that the Claimant neither met or did not meet its burden of proof as to each separate award. We did not find Claimant's expert's opinions completely absolving Claimant from any fault to be credible. As also found important, in our rulings against Claimant, that Claimant did not formally seek an extension of the completion date until near the end of the work and after most of the acceleration efforts were completed.

The Court, therefore, finds that the Claimant has proven its claims and damages, in summary, as follows:

| Count I: | $ 6,549.87 | (agreed by IDOT) |
|----------|------------|------------------|
| Count II: | $ 6,900.00 | |
| Count IV: | $ 14,430.23 | (agreed by IDOT) |
| Count VI: | $117,865.15 | |
| Count VIII: | $120,000.00 | (add 8 incentive days) |
| Count IX: | $187,400.00 | (agreed by IDOT) |
| Total | $453,145.25 | |

We further find that Claimant is not entitled to pre-judgment interest. *Dimmitt & Owens Financial, Inc. v. State* (1992), 44 Ill. Ct. Cl. 25.

Finally, the question of entering an award remains. This Court cannot enter an award unless sufficient funds remain unexpended in the appropriation made to fund the project. (See discussion in *Loewenburg/Fitch Partnership v. State* (1986), 38 Ill. Ct. Cl. 227 and *Ude, Inc. v. State* (1982), 35 Ill. Ct. Cl. 384.) There is no evidence in the voluminous record before the Court as to the exact amounts of released and unexpended funds remaining from the project.

It is this Court's policy in breach of contract claims to limit awards so as not to exceed the amount of funds, appropriated and lapsed, with which payment could have been made. To do otherwise would be the same as granting a deficiency appropriation. The appropriation of State funds is the constitutional prerogative of the Illinois General Assembly. It is the Court's duty to advise the General Assembly. *Thorlief Larsen and Son, Inc. v. State* (1990), 42 Ill. Ct. Cl. 195; *J. F. Inc. v. State* (1988), 41 Ill. Ct. Cl. 5; *Fru-Con Corp. v. State* (1996), 50 Ill. Ct. Cl. 50.

Therefore, the Court orders the Respondent to file with the Court the fiscal data on the project, including the balance of the released funds which lapsed at the conclusion of the project within 10 days. Upon the

Court's receipt of the fiscal information, the Court will enter its final order in this case.

## ORDER

Frederick, J.

This cause comes on to be heard on the Court's own motion following up on the decision entered herein on March 23, 2000. The Respondent has duly filed the requested fiscal information. The Court finds:

Sufficient funds lapsed to cover the damages found so the Claimant is hereby awarded $453,145.25 said sum to be payable from 902 fund monies.